1  EDWARD O. LEAR, State Bar No. 132699
2  **CENTURY LAW GROUP**
   5200 W. Century Blvd., Suite 345
3  Los Angeles, California 90045
   Telephone: (310) 642-6900
4  Facsimile: (310) 642-6910
5
   Attorneys for Plaintiff
6  OSAMA AHMED FAHMY
7
8          **UNITED STATES DISTRICT COURT**

9          **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

10  OSAMA AHMED FAHMY, an          Case No.: CV 07-05715-CAS (Ex)
    individual,
11                                 **PLAINTIFF'S REPLY**
                                   **MEMORANDUM OF POINTS**
12          Plaintiff,             **AND AUTHORITIES IN SUPPORT**
                                   **OF MOTION FOR AN ORDER**
13      vs.                        **SPECIFYING MATERIAL FACTS**
                                   **AND ISSUES OF LAW,**
14  Jay-Z (aka Shawn Carter), Timothy  **INCLUDING FOREIGN LAW,**
    Mosely, Kyambo Joshua, Rob     **THAT EXIST WITHOUT**
15  Bourdon, Brad Delson, Mike Shinoda,  **SUBSTANTIAL CONTROVERSY**
    Dave Farrell, Joseph Hahn, Chester
16  Bennington, Big Bad Mr. Han Music,  **[Fed. R. Civ. Proc. 44.1 and 56(d)]**
    Chesterchaz Publishing, EMI
17  Blackwood Music Inc., EMI Music  Date:        February 28, 2010
    Publishing Ltd., Kenji Kobayashi  Time:        10:00 a.m.
18  Music, Lil Lulu Publishing, Machine  Courtroom:   5
    Shop Recordings LLC, Marcy Projects
19  Productions II, Inc., MTV Networks
    Enterprise Inc., Nondisclosure
20  Agreement Music, Paramount Home
    Entertainment, Inc., Paramount
21  Pictures Corporation, Radical Media,
    Rob Bourdon Music, Roc-A-Fella
22  Records LLC, Timbaland Productions,
    Inc., UMG Recordings, Inc., Universal
23  Music and Video Distribution Inc., and
    Warner Music Inc.,
24
            Defendants.
25
26
27
28

## TABLE OF CONTENTS

I.   INTRODUCTION. ........................................................................................ 1

II.   DEFENDANTS HAVE NOT SHOWN ANY GENUINE ISSUE
REGARDING THEIR PURPORTED "LICENSE" DEFENSE. .......................... 2

   A.   Defendants Have Ignored Basic Principles Of Copyright Law,
   Including The Divisibility Of The Bundle Of Rights That Comprise A
   Copyright Under US Copyright Law. ...................................................... 4

   B.   Plaintiff Has Established That He Is An Owner Of All Copyright
   Rights In Khosara That Were Not Expressly Transferred, And That He Has
   Standing To Pursue The Claims In This Case. ......................................... 6

   C.  Plaintiff Claims That Defendants Have Violated His Exclusive Right To
   Prepare Derivative Works Of Khosara Under US Law, And Defendants Have
   Failed To Show That There Is Any Genuine Issue About The Invalidity Of
   Their Claimed "License" Defense. .......................................................... 7

      1.   It Is An Infringement Of Rights Protected By US Copyright Law To Make
      And Exploit A Derivative Work Without The Consent Of The Owner Of
      Copyright In The Underlying, Original Work. ....................................... 7

      2.   As Plaintiff's Expert, Dr. Loutfi, Has Explained, The "License"  Chain Of
      Title That Defendants Claim To Rely Upon Could Not Have Transferred Any
      Right To Make Derivative Works Of The Khosara Musical Composition As A
      Matter Of Egypt Law. ............................................................................. 8

      3.   Defendants' Opposition Does Not Show That There Is Any Genuine Issue
      About Any "Derivative Works" License, And Does Not Cast Any Genuine
      Doubt On The Correctness Of Dr. Loutfi's Conclusions About Egypt Law ....... 9

         a.   The Opinion Of Defendants' Purported Expert, Dr. Zohny, Is
         Inadmissible; Dr. Zohny Is Not Qualified As An Expert On The Issues
         Actually Presented By This Motion, And He Failed To Reliably Apply A
         Reliable Methodology. ........................................................................ 10

         b.   The Various Agreements That Defendants Have Submitted Merely
         Confirm That No "Derivative Works" License Was Ever Granted By Hamdy
         Or His Heirs. ...................................................................................... 12

      4.   Defendants' Other Arguments Are Contrary To Law. ....................... 19

         a.   Whether Defendants "Changed" The Character Of Khosara, When They
         Prepared Unauthorized Derivative Works, Is Directly Relevant Under Both
         Egypt Law And US Copyright Law. .................................................... 19

         b.   Defendants Did Not Merely "Reproduce" Khosara; They Prepared
         Unauthorized "Derivative Works." .................................................... 20

III.   DEFENDANTS' PROCEDURALLY IMPROPER REQUEST FOR
DISMISSAL IS BASED ENTIRELY UPON A STRAW MAN ARGUMENT
THAT IS IRRELEVANT, AND THAT IS DEVOID OF MERIT IN ANY
EVENT. ......................................................................................................... 22

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**A.  No Motion For Dismissal Or For Any Ruling On Questions Of Subject Matter Jurisdiction Is Properly Before The Court.**.............................................22

**B.  Contrary To Defendants' Arguments, Plaintiff Does Not Base His Affirmative Claims For Relief Upon Egypt's "Moral Rights" Law; Plaintiff's Claims Arise Under The 1976 Copyright Act, And This Court Has Jurisdiction Of Those Claims.**.............................................22

   1.   The Complaint Explicitly Alleges Violation Of Exclusive Rights Protected By The Copyright Act Of 1976; Defendants' Suggestion That The Court Lacks Subject Matter Jurisdiction Over These Claims Is Frivolous.............................22

   2.   Issues Of Moral Rights Under Egypt Law Have Arisen With Respect To The Copyright Claims *Only* Because Of Defendants' *Affirmative Defense – i.e.*, An Alleged License Obtained Through A Chain Of Title Originating in Egypt. 23

   3.   Plaintiff's Claims Are Deeply Rooted In Settled Principles Of US Copyright Law Regarding A Copyright Owner's Right To Control The Creation And Exploitation Of Derivative Works.............................................24

**IV.    CONCLUSION.**.............................................25

PLAINTIFF'S MEMO. Ps&As IN SUPPORT OF MOTION FOR ORDER SPECIFYING MATERIAL FACTS AND ISSUES OF FOREIGN LAW THAT EXIST WITHOUT SUBSTANTIAL CONTROVERSY

1

## **TABLE OF AUTHORITIES**

2

3 CASES

4 *AMC Technology, L.L.C. v. SAP AG*, 78 U.S.P.Q.2d 1834, 2005 WL
3008894 * 5 (E.D. Pa. 2005) ............................................................... 16

5 *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) ................................ 9

6 *Bagdadi v. Nazar*, 84 F.3d 1194, 1197-98 (9th Cir. 1996)...................................5, 6

7 *Batiste v. Island Records, Inc.*, 179 F.3d 217 (5th Cir. 1999)................................. 13

8 *Bridgeport Music, Inc. v. Dimension Films*, 410 F.3d 792 (6th Cir.
2005)............................................................................................. 21

9 *Campbell*, 138 F.3d at 781........................................................................ 10

10 *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361
(1991)...........................................................................................4, 23

11

12 *Films by Jove, Inc. v. Berov*, 154 F.Supp.2d 432, 448 (E.D.N.Y. 2001). ............. 10

13 *Freeplay Music, Inc. v. Cox Radio, Inc.*, 409 F.Supp.2d 259, 262 n. 1
(S.D.N.Y. 2005)................................................................................. 21

14

15 *Greenwich Workshop, Inc. v. Timber Creations, Inc.*, 932 F.Supp.
1210, 1214-15 (C.D. Cal. 1996). ............................................................. 7

16 *Mirage Editions, Inc. v. Albuquerque A.R.T. Co.*, 856 F.2d 1341, 1343
(9th Cir. 1988)................................................................................... 7

17

18 *Negron v. Rivera*, 433 F.Supp.2d 204, 216-17 (D. Puerto Rico 2006),
*aff'd*, 504 F.3d 151 (1st Cir. 2007)............................................................ 8

19

20 *Newton v. Diamond*, 388 F.3d 1189, 1191 (9th Cir. 2004), *citing* 17
U.S.C. § 102(a)(2) and (7)..................................................................... 5

21 *Palladium Music, Inc. v. EatSleepMusic, Inc.*, 398 F.3d 1193, 1197
(10th Cir. 2005) ................................................................................. 7

22

23 *Peer Int'l Corp. v. Pausa Records, Inc.*, 909 F.2d 1332 (9th Cir. 1990) ................ 6

24 *Richlin v. Metro-Goldwyn-Mayer Pictures, Inc.*, 531 F.3d 962, 966 (9th
Cir. 2008), *cert. denied*, 129 S.Ct. 1002 (2007)................................................23

25 *S.O.S.*, 886 F.2d at 1087-88............................................................6, 7, 20

26 *Silvers v. Sony Pictures Entertainment, Inc.*, 402 F.3d 881, 887 (9th Cir.
2005) ............................................................................................. 5

27

28

-iv-

PLAINTIFF'S MEMO. Ps&As IN SUPPORT OF MOTION FOR ORDER SPECIFYING MATERIAL FACTS AND
ISSUES OF FOREIGN LAW THAT EXIST WITHOUT SUBSTANTIAL CONTROVERSY

*State of Cal. on Behalf of California Dept. of Toxic Substances Control v. Campbell*, 138 F.3d 772, 780 (9th Cir.), *cert. denied*, 525 U.S. 822 (1998)..................................................................................................................10

*Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1145 (9th Cir. 2008)........................................................................................................................4

*Universe Sales Co., Ltd. v. Silver Castle, Ltd.*, 182 F.3d 1036, 1038 (9th Cir. 1999)..................................................................................................................11

*Worldwide Church of God v. Philadelphia Church of God, Inc.*, 227 F.3d 1110, 1114 (9th Cir. 2000) ..........................................................................9

## STATUTES

15 U.S.C. § 501(b)....................................................................................................5

17 U.S.C. § 101..........................................................................................7, 21, 23

17 U.S.C. 103(b)........................................................................................................8

17 U.S.C. § 106..............................................................................................4, 20, 25

17 U.S.C. § 106(1)...................................................................................................20

17 U.S.C. § 106(2)..............................................................................3, 4, 6, 20, 24

17 U.S.C. § 115.......................................................................................................19

17 U.S.C. § 115(a)(2) ..................................................................................19, 20, 25

17 U.S.C. § 201(d)(2) ................................................................................................5

28 U.S.C. §§ 1331, 1338..........................................................................................23

Art. 37, Egypt Copyright Law ...................................................................12, 13, 15

Art. 38, Egypt Copyright Law ..........................................................................1, 9, 15

Articles 7, Egypt Copyright Law................................................................1, 9, 12

Fed.R.Civ.Proc. 44.1...............................................................................................11

## OTHER AUTHORITIES

Berne Implementation Act.  Pub. L. No. 100-568....................................................24

TREATISES

1 Copyright Throughout the World § 14:9 .................................................................. 6

1 Copyright Throughout the World § 14:20 ............................................................. 13

Modern Licensing Law § 6:22 .................................................................................. 20

*Nimmer on Copyright* § 8.02[A] ............................................................................ 21

R. Rigamonti, *Deconstructing Moral Rights*, Harvard Int'l L.J., Vol. 47, No. 2, 353, 368 (Summer 2006) ................................................................... 25

W. Patry, Patry on Copyright §3:22 ....................................................................... 21

## I.   INTRODUCTION.

It is now established beyond dispute that Baligh Hamdy was an Egyptian national who authored the musical composition "Khosara, Khosara," and registered the copyright with Egypt's copyright society in 1960.  Also established is the fact that Plaintiff is one of Mr. Hamdy's heirs.  Further, it is established that the copyright to this work vested under Egypt law, and Egypt law controls any agreement by the author or his heirs to transfer any of the rights at copyright.

Defendants' Opposition presents a license defense.  It is their burden to establish a chain of title, from Mr. Hamdy or his heirs, authorizing the specific uses they made of the "Khosara" composition through a number of new works that not only copy the most memorable part of the composition but also dramatically transform it with new, profane and misogynistic lyrics and music of a fundamentally different nature.[1]

Defendants have not been able to point to any such authorization from the author, or his heirs.  Under Articles 7 and 38 of the Egypt's copyright law of 1954, which governs any purported transfer of rights in the "Khosara"composition, the right to modify or changes the nature of a work is a right of the author that is personal and inalienable.  Reply Decl. of Dr. Louti, ¶¶ 3,5,7.  Only rights to faithfully perform and reproduce the work through specified media may be conveyed.  *Id.*  Derivative works that modify the work in any significant way, or change its character, may only be made with *specific consent* by the author or his heirs, on a case-by-case basis.  2006 Dr. Loutfi Decl. ¶ 9 (Doc# 226-4).

Defendants' license argument fails as a matter of law for many reasons.  First, no license in the "chain of title" that Defendants purport to rely upon could have included any right to modify or change the Khosara musical composition, as a matter of Egypt law (which governs alienability issues).  Second, any economic

---

[1]  Recordings of "Khosara, Khosara," "Big Pimpin," and "Big Pimpin/Papercut," as well as copies of lyrics are lodged herewith under Plaintiff's Notice of Lodgment and Lear Declaration.

PLAINTIFF'S REPLY MEMO. Ps&As RE MOTION FOR ORDER SPECIFYING MATERIAL FACTS AND

1  rights that were conveyed by Hamdy or his heirs were necessarily limited by Egypt
2  law, and could not have included the right to make derivative works that
3  fundamentally changed the character of Khosara.  Thus, even if defendants acquired
4  some economic rights by license, their new musical works derived from "Khosara"
5  were beyond the scope of any license they may have, and constituted infringement.

6       Unable to muster any true dispute of Plaintiff's right to control derivative uses
7  of the "Khosara" composition, Defendants employ a diversion, erecting a straw man
8  they then labor to knock down.  Defendants mischaracterize Plaintiff's claim as one
9  for violation of Egyptian moral rights, then devote the lion's share of their
10 Opposition to this false issue.  This sideshow wastes the Court's limited resources.

11      Plaintiff explicitly pleads copyright infringement claims under U.S. law.  This
12 Court has jurisdiction of those claims as a matter of black letter law.  Vindicating
13 the exclusive right to prepare derivative works under the U.S. Copyright Act can, in
14 some cases, have the effect of protecting rights that are in the nature of what other
15 countries recognize as the author's moral right of integrity.  But that does not
16 convert the claim for violation of the derivative works right, under U.S. copyright
17 law, into a claim under foreign moral rights law.  Defendants—whose alleged
18 infringements are occurring in the US, not Egypt--make "jurisdictional" arguments
19 that are a red herring, nothing more.

20      For these reasons, explained below and in the concurrently-filed Reply
21 Declaration of Dr. Loutfi, the Court should grant Plaintiff's motion.

22 **II.    DEFENDANTS HAVE NOT SHOWN ANY GENUINE ISSUE
         REGARDING THEIR PURPORTED "LICENSE" DEFENSE.**
23
24      In his opening papers, Plaintiff specified the material facts that are pertinent
25 to his claim of copyright ownership in the Khosara musical composition, and hence
   his standing to assert the claims herein.  *See* Statement of Uncontroverted Facts
26 [Doc. # 226-1] ("UF"), ¶¶ 1-18.  Notably, material facts 1-16 are *undisputed*.  *See*
27 Defendants' Statement of Genuine Issues [Doc. # 243-1] ("SGI"), ¶¶ 1-16.  In
28

-2-

1  addition, Plaintiff stated the principles of law, including Egypt law, that should
2  govern the factual issues presented by this Motion. UF, pp. 6-11. Defendants'
3  Opposition papers have largely ignored those questions of law. Neither Defendants'
4  SGI nor their Opposition respond to *most* of these legal questions. For instance
5  Plaintiff explained in his Opening Brief that Egypt's 1954 copyright law governs the
6  question of what kinds of rights in the Khosara musical composition could be the
7  subject of an effective license to anyone in Defendants' chain of title.[2] Defendants
8  make no contrary argument. They concede that Egypt law governs.

9      Defendants dispute only two of the material facts proven by Plaintiff, *i.e.*, that
10 Plaintiff "did not authorize Sout El Phan to exercise any of the artist's rights under
11 Egyptian law to make changes to the melody, make a new arrangement, arrange the
12 melody with different lyrics, adapt, synchronize with images or otherwise
13 fundamentally change 'Khosara Khosara'"; and Plaintiff "never attempted to make
14 any general transfer or sale to any third party of the heirs' rights to control all
15 changes in Baligh Hamdy's works." UF ¶¶ 17-18. Defendants also argue that
16 additional facts they offer are somehow "material," but all of this goes to the same
17 narrow question: did Defendants ever obtain any license or other consent that gives
18 them a viable defense to Plaintiff's claim that they violated his exclusive right under
19 17 U.S.C. § 106(2) to authorize derivative works of the Khosara composition?

20     There is, of course, *no evidence* that any Defendant ever obtained Plaintiff's
21 consent to use Khosara in the *specific* infringing works at issue in this case –
22 including various releases of "Big Pimpin'" and "Big Pimpin/Papercut" andother
23 works identified in the Complaint. Instead, Defendants claim to have some kind of
24 *blanket* license, through a convoluted chain of title going back to the composer of
25 Khosara himself, that somehow *impliedly* included the right to make derivative
26 works that fundamentally modify the Khosara musical composition. For reasons

27 _____
[2] Pertinent provisions of the 1954 law are discussed in the 2006 Decl. of Dr. Loutfi (Doc 226-4)
28 and are set forth at Para. 7 of Dr. Loutfi's Reply Decl filed herewith.

1 | discussed below, Defendants failed to show the existence of any such license, or any
2 | genuine issue for trial about whether any such rights were granted to them.

3 |     Accordingly, the Court should grant Plaintiff summary judgment with respect
4 | to the Defendants' license defense. In the alternative, if for any reason the Court
5 | does not grant summary judgment as to the entirety of Defendants' license defense,
6 | the Court should enter an order stating all material facts and questions of foreign law
7 | that are not genuinely in dispute, and order those matters established for trial.

8
9

### A. Defendants Have Ignored Basic Principles Of Copyright Law, Including The Divisibility Of The Bundle Of Rights That Comprise A Copyright Under US Copyright Law.

10 |     When it came time to prepare their Opposition, it appears that Defendants put
11 | on blinders, and ignored the nature of the claims against them. We therefore begin
12 | by placing this motion in its proper context.

13 |     Plaintiff sued Defendants for copyright infringement under the US Copyright
14 | Act. To prevail, Plaintiff must prove that: (1) he is the owner of a valid copyright;
15 | and (2) the Defendants copied original elements from the copyrighted work. *Feist*
16 | *Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). The Ninth
17 | Circuit considers the word "copied" as "shorthand" for the various activities that
18 | may infringe "any of the copyright owner's … exclusive rights described at 17
19 | U.S.C. § 106." *S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1085 n. 3 (9th Cir. 1989).

20 |     The US Copyright Act confers upon the owner of copyright what is
21 | frequently called a "bundle of rights," including the reproduction, distribution, and
22 | performance rights. 17 U.S.C. § 106. One of the "sticks" in that bundle is the
23 | exclusive right of the owner of copyright "to prepare derivative works based upon
24 | the copyrighted work." 17 U.S.C. § 106(2).

25 |     "The 1976 Copyright Act largely eliminated the doctrine of indivisibility [that
26 | existed under the 1909 Act] and codified the divisibility of the bundle of rights that
27 | constitutes a copyright." *Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137,
28 | 1145 (9th Cir. 2008). Now, "the various rights included in a copyright are divisible

– 4 –

1  and … 'any of the exclusive rights comprised in a copyright … may be transferred
2  … and owned separately.'" *Bagdadi v. Nazar*, 84 F.3d 1194, 1197-98 (9th Cir.
3  1996), *quoting* 17 U.S.C. § 201(d)(2). Thus, the "reproduction" right may be owned
4  separately from the "derivative works" right. *See* R. Nimmer, J. Dodd, Modern
5  Licensing Law § 6:22 (2010) ("The reproduction and derivative work rights are
6  independent rights. Most importantly, for licensing purposes, one can be covered by
7  a license even though both are not.").

8      Further, the owner of *any particular exclusive right* "is entitled, to the extent
9  of that right, to all of the protection and remedies accorded to the copyright
10 owner…." 17 U.S.C. § 201(d)(2). "[E]ach separate owner of a subdivided
11 exclusive right may sue to enforce that owned portion of an exclusive right, no
12 matter how small." *Silvers v. Sony Pictures Entertainment, Inc.*, 402 F.3d 881, 887
13 (9th Cir. 2005); *see also,* 15 U.S.C. § 501(b) ("The legal or beneficial owner of an
14 exclusive right under a copyright is entitled … to institute an action for infringement
15 of that particular right committed while he or she is the owner of it.")

16     In addition, as we explained in the Opening Brief (*see* p. 22), "[s]ound
17 recordings[3] and their underlying compositions[4] are separate works with their own
18 distinct copyrights." *Newton v. Diamond*, 388 F.3d 1189, 1191 (9th Cir. 2004),
19 *citing* 17 U.S.C. § 102(a)(2) and (7). It necessarily follows that a license of rights in
20 one is not necessarily a license of rights in the other. This is also the law in Egypt.

21

22 [3] "'Sound recordings' are works that result from the fixation of a series of musical, spoken, or
other sounds, but not including the sounds accompanying a motion picture or other audiovisual
23 work, regardless of the nature of the material objects, such as disks, tapes, or other phonorecords,
in which they are embodied." 17 U.S.C. § 101. Thus, copyright in a particular sound recording of
24 music extends only to the particular fixation of the series of musical sounds in that specific sound
recording, and is not co-extensive with the copyright in the underlying musical composition. *See*
25 US Copyright Office Circular 56A, "Copyright Registration of Musical Compositions and Sound
Recordings," p. 1 ("Copyright in a sound recording is not the same as, or a substitute for,
26 copyright in the underlying musical composition.").

27 [4] "Section 102(a)(2) of the 1976 Act protects 'musical works, including any accompanying
words.' No definition of the category is provided because it was believed to have a 'fairly well
28 settled meaning.'" Patry on Copyright § 3:93.

1   *See* 1 Copyright Throughout the World § 14:9 (musical work is a type of literary

2   and artistic work) and § 14:10 (sound recordings are separately protected "as related

3   rights"); *see also* Loutfi Decl. ¶¶ 6-7 (Hamdy's copyright in the Khosara musical

4   composition and Sout El Phan's copyright interest in sound recordings are

5   separately registered in Egypt). Under Egypt law, the holder of rights in a sound

6   recording does not have the right to make changes or modification of the underlying

7   musical composition. Loutfi Decl. ¶ 7.

8        Thus, Defendants' claim to hold a license *of some kind* is merely the

9   beginning, not the end, of the analysis. "An exclusive licensee owns separately *only*

10  'the exclusive rights comprised in the copyright' that are the subject of the license."

11  *Bagdadi*, 84 F.3d at 1197-98 (emphasis added), *quoting* 17 U.S.C. § 201(d)(2). "A

12  licensee *infringes* the owner's copyright if its use *exceeds the scope* of its license.

13  The critical question is not the existence but the *scope of the license*." *S.O.S.*, 886

14  F.2d at 1087-88 (emphases added) (citation omitted).[5]

15       **B.**    **Plaintiff Has Established That He Is An Owner Of All Copyright**
                **Rights In Khosara That Were Not Expressly Transferred, And**

16               **That He Has Standing To Pursue The Claims In This Case.**

17       The material facts identified in Plaintiff's Statement of Uncontroverted Facts,

18  paragraphs 1-16, establish Plaintiff's *own* chain of title, and show that Plaintiff is an

19  owner of copyright in the Khosara musical composition, and has standing to pursue

20  the claims in this case. Since Defendants do not dispute *any* of these facts, they

21  should be deemed conclusively established in this case.

22       **C.**    **Plaintiff Claims That Defendants Have Violated His Exclusive**
                **Right To Prepare Derivative Works Of Khosara Under US Law,**

23

24    [5]  Defendants are not assisted by *Peer Int'l Corp. v. Pausa Records, Inc.*, 909 F.2d 1332 (9th Cir.
1990). *Peer* concerned non-payment of royalties under the mechanical license provisions of the

25  Copyright Act; there was no issue in *Peer* of whether a license to defendants included the right to
prepare derivative works. Moreover, Defendants have misrepresented *Peer* with a selective

26  quotation. *Peer* actually said this: "Generally, 'anyone who is authorized by the copyright owner
to use the copyright work in a way specified in the statute … is not an infringer of the copyright

27  *with respect to such use*.'" *Peer*, 909 F.2d at 1338 (citation omitted) (emphasis added).
Defendants omitted the phrase in italics. Opp. p. 17. *Peer* thus supports the principle discussed in

28  the text above that a licensee is an infringer if it exceeds the scope of its license.

1

**And Defendants Have Failed To Show That There Is Any Genuine Issue About The Invalidity Of Their Claimed "License" Defense.**

2

    1.    <u>It Is An Infringement Of Rights Protected By US Copyright Law To Make And Exploit A Derivative Work Without The Consent Of The Owner Of Copyright In The Underlying, Original Work</u>.

3

4

Again, the mere fact that Defendants claim to have a license regarding certain

5

sound recordings of Khosara does not end the inquiry. To the contrary, even

6

someone who is undisputedly a licensee is nevertheless an infringer if he exceeds

7

the scope of the license. *S.O.S.*, 886 F.2d at 1087-88.

8

Here, Plaintiff alleges that Defendants are infringers of his copyright in

9

Khosara. Despite any license Defendants claim to have, the accused works were

10

new "derivative works" of the underlying Khosara musical composition, and under

11

Egypt law no agreement making a blanket assignment or general license of rights to

12

make derivative works based upon and modifying the Khosara musical composition

13

was, or could have been, granted to the Defendants. *See* Complaint ¶¶ 3, 18, 20-22,

14

28, 34. Violation of a copyright owner's exclusive right to prepare derivative works

15

is – in itself – copyright infringement. *See, e.g., Mirage Editions, Inc. v.*

16

*Albuquerque A.R.T. Co.*, 856 F.2d 1341, 1343 (9th Cir. 1988); *Greenwich Workshop,*

17

*Inc. v. Timber Creations, Inc.*, 932 F.Supp. 1210, 1214-15 (C.D. Cal. 1996).

18

And the exclusive right to prepare derivative works from a musical

19

composition includes the right to make a new "musical arrangement" or "sound

20

recording" based upon the original underlying musical composition. 17 U.S.C. §

21

101 (defining "derivative work"[6]); *see also, Palladium Music, Inc. v.*

22

*EatSleepMusic, Inc.*, 398 F.3d 1193, 1197 (10th Cir. 2005) (sound recordings were

23

"derivative works of the underlying musical compositions"); *Negron v. Rivera*, 433

24

25

---

[6] A "derivative work" is defined as "a work based upon one or more pre-existing works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted. A work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole represent an original work of authorship, is a 'derivative work.'" 17 U.S.C. § 101.

26

27

28

–7–

1  F.Supp.2d 204, 216-17 (D. Puerto Rico 2006), *aff'd*, 504 F.3d 151 (1st Cir. 2007)
2  (finding that one musical composition was a derivative work based upon preexisting
3  material in another musical composition ). Moreover, the mere making of a
4  derivative work of a musical composition, by making a new sound recording of it,
5  "does not imply any exclusive right in the preexisting material." 17 U.S.C. 103(b).
6  Any copyright in the derivative work sound recording is "independent of, and does
7  not affect or enlarge the scope, duration, ownership, or subsistence of, any copyright
8  protection in the preexisting material." *Id.*

9     Hence it is clear that the *scope* of the license that Defendants purport to rely
10 upon is the crux of the matter. Have Defendants shown material evidence as to
11 whether they acquired any license that included within its scope the right to prepare
12 derivative works like "Big Pimpin" and Big Pimpin/Papercut that derive from and
13 fundamentally modify Khosara. On this question the Defendants' brief is
14 remarkably silent. Except when the Opposition quotes from Plaintiff's own papers,
15 or quotes the opinion of Plaintiff's own expert, the Opposition does not once use the
16 word "derivative." The Opposition does not cite *any* authority either regarding the
17 derivative works right, or transfers of that right under Egypt (or US) law. For these
18 reasons alone, Defendants have failed to show the existence of any genuine issue
19 that defeats this motion. Their silence as to whether the right to make new
20 *derivative works* was licensed to anyone in the Defendants' claimed chain of title is
21 tantamount to an admission that *no evidence* proves any such right was granted.

22         2.   As Plaintiff's Expert, Dr. Loutfi, Has Explained, The "License"
             Chain Of Title That Defendants Claim To Rely Upon Could Not
23           Have Transferred Any Right To Make Derivative Works Of The
             Khosara Musical Composition As A Matter Of Egypt Law.
24

25     As Dr. Loutfi has explained, Article 38 of Egypt's Law No. 354 of the Year
26 1954 makes inalienable the author's "right to make modifications or changes to his
27 work." Loutfi Decl. ¶ 9; Loutfi Reply Decl. ¶¶ 5, 8. Article 38 states: "All acts of
28 disposal involving the rights prescribed in Article 5 (first clause), *Article 7 (first*

-8-

1   *clause*) and Article 9 of the present law, *shall be null and void*." *See* Loutfi Decl,

2   Ex. D, Art. 38 (emphases added).  The first clause of Article 7 states: "The author

3   shall *alone* have the right to introduce whatever modifications or changes he

4   chooses in his compiled work."  Loutfi Decl., Ex. D, Art. 7 (emphasis added).

5   Egypt law also requires that any "disposal" of "financial exploitation rights" to

6   faithfully perform or reproduce the work "be in writing" and "determine expressly

7   and detail, every right separately, which is subject of such disposal act."  Loutfi

8   Decl., Ex. D, Art. 37; Loutfi Reply Decl., filed herewith, ¶¶ 5, 9.

9        Read together, these provisions of Egypt law show that the right to make

10   "modifications or changes" to the Khosara musical composition was *not* one of the

11   "financial exploitation rights" that could be disposed of; any attempted disposal of

12   the right to make "modifications or changes" would have been "null and void."

13   Art. 7 (first clause); Art. 38.  And even if making "modifications or changes" were a

14   financial right – it is not – it would still have to be the subject of an express, detailed

15   document of transfer.  Art. 37.  Defendants have not identified any such document.

16           3.    Defendants' Opposition Does Not Show That There Is Any
             Genuine Issue About Any "Derivative Works" License, And

17                Does Not Cast Any Genuine Doubt On The Correctness Of Dr.

18                Loutfi's Conclusions About Egypt Law.

     "The existence of a license creates an affirmative defense to a claim of

19   copyright infringement."  *Worldwide Church of God v. Philadelphia Church of God,*

20   *Inc.*, 227 F.3d 1110, 1114 (9th Cir. 2000).  Proving a defense is Defendants' burden.

21        "[T]he mere existence of *some* alleged factual dispute between the parties will

22   not defeat an otherwise properly supported motion for summary judgment; the

23   requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty*

24   *Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (original emphases).  The relevant inquiry

25   is threefold: "is there a genuine issue, is that issue about a material fact, and is the

26   moving party entitled to judgment as a matter of law."  *State of Cal. on Behalf of*

27   *California Dept. of Toxic Substances Control v. Campbell*, 138 F.3d 772, 780 (9th

28

–9–

1  Cir.), *cert. denied*, 525 U.S. 822 (1998). The non-moving party "must show that

2  there is a *genuine* dispute." *Campbell*, 138 F.3d at 781 (original emphasis).

3      Determination of a foreign country's law is a question of law for the Court,

4  Fed.R.Civ.Proc. 44.1, and thus "disagreements among experts about [foreign] law

5  do not stand in the way of a grant of summary judgment...." *Films by Jove, Inc. v.*

6  *Berov*, 154 F.Supp.2d 432, 448 (E.D.N.Y. 2001).

7                  a.      The Opinion Of Defendants' Purported Expert, Dr. Zohny,
                           Is Inadmissible; Dr. Zohny Is Not Qualified As An Expert
8                          On The Issues Actually Presented By This Motion, And
                           He Failed To Reliably Apply A Reliable Methodology.
9
        There is need for testimony of an expert in connection with this motion for
10
   one reason alone: to assist the Court in determining what Egypt law is. As shown in
11
   Plaintiff's Opening Brief, Egypt law controls the question of what kinds of rights
12
   could validly be the subject of a copyright license from the composer Baligh
13
   Hamdy, an Egyptian, or his Egyptian heirs, with respect to Khosara, a work of
14
   Egyptian origin. Op. Br., p. 18. Defendants do not argue the contrary, and thus
15
   concede application of Egypt law. *See also*, SGI, ¶ 19 (conceding that Hamdy's
16
   1968 agreement with Sout el Phan is governed by Egypt law).
17
        But Dr. Zohny candidly admitted in his deposition that he is *not* an expert on
18
   Egyptian copyright law. Zohny TS 32 (Ex. 1 to Lear Decl.)("I cannot claim I am
19
   expert in – on U.S. intellectual property law or Egyptian intellectual property law.").
20
   This is more than sufficient reason to disregard *all* of Dr. Zohny's opinions.
21
        Despite his disclaimer of the requisite expertise, Dr. Zohny offers two broad
22
   opinions: "(1) Plaintiff's claims are moral rights claims for 'mutilation and
23
   distortion' of 'Khosara Khosara,' which is a claim not recognized by U.S. copyright
24
   law and over which the U.S. courts lack jurisdiction," and "(2) as opposed to moral
25
   rights, Defendants received the economic rights (the only rights recognized under
26
   U.S. law) to use 'Khosara Khosara.'" Zohny Decl. ¶ 3. Dr. Zohny has no
27
   admissible opinion to offer on these subjects for reasons we explain below.
28

-10-

1    First, the *Plaintiff* is the one who knows what his claims are, not Dr. Zohny.

2   In fact, the argument that Plaintiff's copyright infringement claim is based upon

3   Egyptian moral rights law is a red herring. Plaintiff makes no such claim. A

4   supposed expert opinion about a red herring is irrelevant, and inadmissible.

5    Second, while the opinions of experts on foreign law may properly be

6   considered by the Court,[7] this *Court* is the expert about what *United States* law is,

7   what rights are recognized under *United States* law, and what claims are within this

8   Court's subject matter jurisdiction. Questions of US law are not proper subjects for

9   opinion by an "expert" witness. *See, e.g., Aguilar v. International Longshoremen's*

10  *Union Local No. 10*, 966 F.2d 443, 447 (9th Cir. 1992).

11   Third, Dr. Zohny did not reliably apply a reliable methodology to reach his

12  conclusions about what kinds of rights were transferred to Defendants under the

13  instruments he reviewed. Dr. Zohny merely describes the documents generally and,

14  without pointing to any language that was effective to transfer the rights in question,

15  pulls out of thin air a broad conclusion that *every conceivable right* must have

16  *somehow* been conveyed. This is the classic *ipse dixit.* Especially coming from an

17  admitted non-expert on the subject matter, it is of no help to the Court at all.

18   Finally, and most important, Dr. Zohny completely failed to address the crux

19  of the matter. The key issue of Egypt law presented by this motion is whether the

20  right to newderivative works that are based on Khosara while fundamentally

21  changing its lyrics and music, was or could have been conveyed to Defendants

22  through the chain of title upon which they rely. Dr. Zohny's Declaration provides

23  *no answer.* And his deposition testimony is certainly of no help to Defendants

24  either. First, he admitted that he *did not consider* whether Defendants created

25  derivative works without the consent of the owner of the exclusive right to make

26  derivative works. Zohny Depo. 117: 3-7 (Ex. 1to Lear Decl). He also admitted that

27  ---
     [7] Fed.R.Civ.Proc. 44.1; *Universe Sales Co., Ltd. v. Silver Castle, Ltd.*, 182 F.3d 1036, 1038 (9th
28  Cir. 1999) (expert testimony "basic mode of proving foreign law.").

-11-

1  the 1968 agreement between Hamdy and Sout El Phan did *not* provide for a general
2  transfer of the right to prepare derivative works. *Id.* 151:18-152:6. With respect to
3  the August 8, 1995 Authorization, he asserted a completely different opinion, one
4  that contravenes Egypt law. Although Dr. Zohny acknowledged that the right to
5  create derivative works is governed by Egypt's Law No. 354, Art. 7 (*id.* 152:14-25),
6  he nevertheless opined that in the 1995 Fahmy/Sout El Phan agreement the right to
7  create derivative works somehow was licensed – not expressly – but by implication.
8  *Id.* 155:15-24. The notion that this might have been possible conflicts with
9  mandatory provisions of Egypt law, in at least two respects. First, the right under
10  Law No. 354, Art. 7 (first clause) to make modifications or changes to a work
11  cannot be transferred by the author as a matter of Egypt law. Law No. 354, Art. 38.
12  Second, even if the derivative works right were one of the "financial exploitation
13  rights" (it is not, as Dr. Zohny admitted), it could not be licensed without a "writing"
14  that "determine[d] expressly and in detail, every right separately." Art. 37.

15      We will address these points more fully in the Plaintiff's separately-filed
16  Objections to Defendants' Evidence. In addition, Plaintiff will be filing a *Daubert*
17  motion that seeks an Order excluding Dr. Zohny as an expert witness.

18                b.    The Various Agreements That Defendants Have
                       Submitted Merely Confirm That No "Derivative Works"
19                     License Was Ever Granted By Hamdy Or His Heirs.

20      Defendants rely on a supposed *chain* of title that resulted in a license they
21  offer as a defense to infringement. To defeat this motion, Defendants must show
22  that *each link* in the chain granted *all* of the necessary rights to make the works that
23  Plaintiff claims are infringing. Defendants have failed to carry that burden. They
24  also failed to show the existence of any genuine issues of material fact.

25      *All* of the documents in Defendants' purported chain of title share the same
26  fatal defect: not one of them makes *any* mention of any grant of the right to make
27  new *derivative works* that are based on, and fundamentally modify, any *musical*
28  *composition*. Neither the Opposition, nor Dr. Zohny's Declaration, identifies any

-12-

1  provision in the chain of title that expressly deals with the derivative work right.
2  That is because no such provision exists.

3       The license defense cannot be proven.  Under Egypt law, for a "disposal" of
4  any "financial exploitation rights" to have effect, such rights "shall be made in
5  writing and shall determine *expressly* and *in detail*, every right *separately*, which is
6  subject of such disposal act, along with indicating its range, *its purpose*, and the
7  period and place of exploitation."  Law No. 354, Art. 37 (emphases added); *see also,*
8  1 Copyright Throughout the World § 14:29 (same).  And  the author's exclusive
9  right to make "modifications" or "changes" (Law No. 354, Art. 7) cannot be
10  "disposed" of by the author at all; an attempted disposal of that right is "null and
11  void" (Law No. 354, Art. 38); *see also* Loutfi Reply Decl.¶7;1 Copyright
12  Throughout the World § 14:20 ("moral rights are perpetual, inalienable, and
13  imprescriptible").

14       Further, "[i]n case of conflict between moral rights and economic rights, the
15  former prevail."  *Id.*; *see also* Loutfi Reply Decl., filed herewith, ¶ 5(precedent on
16  primacy of moral rights).  For example, Article 3 provides protection for derivative
17  works.  Law No. 354, Art. 3.  But protection of derivative works is expressly
18  "subject to the right of the author of the *original* work."  *Id.* (emphasis added).

19       Defendants are not assisted by *Batiste v. Island Records, Inc.*, 179 F.3d 217
20  (5th Cir. 1999).  First, there was no issue of foreign law, much less Egypt law, in
21  *Batiste*.  Second, *Batiste* found that the licensee and sublicensee effectively secured
22  *all* of the copyright in *both* the underlying musical composition *and* the original
23  sound recording of that composition.  179 F.3d at 219-20, 222.  The opposite is true
24  here.  Defendants failed to show any genuine issue about whether *any* link in their
25  purported chain of title granted them, or could have granted them, a general license
26  to make derivative works, or to fundamentally change or modify the Khosara
27  *composition*, under Egypt law.  We explain more fully below.

28       The 1968 Hamdy/Sout El Phan Agreement.  Defendants concede that this

-13-

1   agreement is governed by Egypt law. SGI 19; Zohny Decl. ¶ 14. Defendants *argue*
2   that this agreement "included a conveyance to Sout El Phan of … publishing rights,
3   in *Khosara*." SGI 19. *But no evidence supports this assertion.* Defendants cite as
4   evidence Paragraph 14 of the Zohny Declaration. No such opinion is stated there.

5       By using the word "publishing," the Defendants are apparently trying to
6   create the false impression that the 1968 agreement transferred rights in the Khosara
7   *musical composition.* The agreement itself shows otherwise. First, the 1968
8   agreement does not once use the word "publish"; that is merely Defendants'
9   characterization of the agreement. And Defendants' expert admitted in deposition
10  that the word "publish" merely means to release the work to the public. Zohny
11  Depo. 172:7-20. The 1968 agreement granted Sout El Phan certain rights in *sound*
12  *recordings.* Loutfi Reply Decl. ¶ 12, 14. Thus, "publication" refers to the right to
13  release records publicly. *Id.* And Dr. Zohny admitted that Sout El Phan is known as
14  a "record company" in Egypt. Zohny Depo., Vol. 2, 224:22-24.

15      Second, the 1968 agreement was not a transfer of any right to change or
16  modify any *musical composition.* Loutfi Reply Decl. ¶ 12. The agreement makes it
17  clear that Sout El Phan obtained right only with respect to "records" – *i.e.*, sound
18  recordings. *See* Zohny Decl., Ex. 3. The 1968 agreement gave Sout El Phan the
19  exclusive right to reproduce and distribute sound recordings of Hamdy's melodies.
20  *Id.,* First Article. But *Hamdy* retained "sole and full ownership" of the melodies –
21  *i.e.*, the underlying musical compositions. *Id.*, Third Article ("Mr. Baleegh Hamdy
22  may prepare melodies at his own expense, for which he will have sole and full
23  ownership, and present them to the company to print on its records….").

24      Moreover, Dr. Zohny testified in deposition that the 1968 agreement did *not*
25  provide for a general transfer of the rights to make derivative works based upon the
26  Khosara musical composition, to make a new arrangement of Khosara with new
27  lyrics, or to arrange the composition with a transformative orchestration, like rap or
28  heavy metal music. Zohny Depo. 151-152. Dr. Zohny also acknowledged that the

-14-

1  derivative works right is governed by Article 7 of Law 354. *Id.* at 153. The right to
2  change or modify a work, equivalent to the derivative works right under US law, is
3  personal and inalienable under Egypt law. It cannot be the subject of a general
4  transfer by assignment or license. Loutfi Decl. ¶ 9; Loutfi Reply Decl.¶5.

5  The August 8, 1992 Authorization. The Authorization states that it was
6  "given in execution of the contract signed between the late Baleegh Hamdi and the
7  company on 12/12/68." SGI ¶ 20. The Authorization's true meaning thus must be
8  informed by the meaning of the 1968 Agreement itself which, as we explained
9  above, could not, and did not, include any license of any derivative works right.

10  Further, nothing in the Authorization purports to license to Sout El Phan any
11  right to modify any underlying musical composition. Loutfi Reply Decl. ¶ 12.
12  After all, any purported transfer of the author's exclusive right to make changes or
13  modifications is null and void. Law No. 354, Art. 7 and 38.

14  Dr. Zohny conceded in deposition that the Authorization does not include any
15  *express* license of any derivative works right with respect to Khosara, but he
16  expressed the opinion that Sout El Phan nevertheless somehow obtained a right to
17  make derivative works under the Authorization *by implication*. Zohny Depo.
18  155:15-24. This opinion is manifestly unreliable because it contradicts Egypt law.
19  As we explained above, the right to make changes or modify a work, *i.e.*, create a
20  new derivative work, cannot be the subject of a general transfer by assignment,
21  license or otherwise at all. But even if the derivative works right were a "financial"
22  or economic right (it is not), a license of that right would have required a writing
23  that "determine[d] expressly and *in detail*, every right *separately*, which is subject of
24  such disposal act, along with indicating its range, its purpose, and the period and
25  place of exploitation." Law No. 354, Art. 37 (emphases added). Defendants have
26  not identified any provision in the Authorization that meets this standard.

27  The Sout El Phan – EMI Music Arabia License Agreement. For reasons
28  explained above, Sout El Phan never obtained any license of any right to make new

-15-

1  derivative works based on Khosara.  Since that is so, the inquiry should end here;

2  the Court need not consider whether any claimed rights-holder downstream of Sout

3  El Phan acquired any derivative works right, because a licensee cannot, as matter of

4  logic and law, sublicense any rights that the licensee itself never obtained.  *See, e.g.,*

5  *AMC Technology, L.L.C. v. SAP AG*, 78 U.S.P.Q.2d 1834, 2005 WL 3008894 * 5

6  (E.D. Pa. 2005) ("A defendant in a contributory copyright infringement case cannot

7  use as a defense its own grant of a sublicense exceeding the scope of its license.").

8     The License Agreement itself confirms that Sout El Phan was in no position

9  to, and therefore did not, grant any derivative works right regarding the Khosara

10  musical composition to EMI Music Arabia.  To the contrary, the rights that Sout El

11  Phan sublicensed to EMI Music Arabia related solely to *sound recordings*, because

12  those were the only rights that Sout El Phan had the power to sublicense.

13     The grant clause of the License provided as follows:

14     "LICENSOR hereby **grants by way of license** to EMI the sole and exclusive
       right throughout the Territory **to exploit each and every sound recording**
15     **from the Catalogue** during the Term as hereinafter appears, such right to
       comprise the following:"  (Zohny Decl., Ex. 5, page EMI0005, § 2 (A)
16     (emphases added).)

17  The term "Catalogue" is defined as "the entire **catalogue of sound recordings**

18  owned or controlled by Licensor, (including those recordings set out in [Schedules 1

19  through 3])."  *Id.,* page EMI0003 §1 (emphasis added).)  Specific rights with respect

20  to the "Catalogue" are listed, and *all* of them refer to "records."  *Id.,* pages EMI0005-

21  06, § 2(A)(i)-(viii).  EMI Music Arabia's obligations as licensee concerned

22  "**record**" manufacturing, release and production.  *Id.*, page EMI0006, § 2(B).  Sout

23  El Phan's obligations as licensor concerned delivery of *master tapes of sound*

24  *recordings* and supply of label information for packaging and advertising of "*the*

25  *recorded work*."  *Id.*, pages EMI0007-08, § 3(A)-3(E)(emphasis added).  License

26  fees payable by EMI were with respect to "sound recordings."  *Id.*, pages EMI0008 §

27  5 (License Fees) and EMI0026 (annexure stating fee calculation).  Sout El Phan's

28  warranties pertained only to sound recordings.  *Id.*, pages EMI0009-10, § 6(A)-6(E).

-16-

1   Ancillary rights also pertained only to "records." *Id.,* page EMI0011, § 7(C).

2       The License Agreement concerned *records*, and only *records*. Loutfi Reply

3   Decl. ¶ 12. Dr. Zohny confirmed as much in his deposition.[8] Zohny Depo. 173:21-

4   180:24(Ex. 1 to Lear Decl.) Not surprisingly, there is *no argument* in Defendants'

5   Opposition that the License Agreement included *any* license of any derivative works

6   right (or any other right) with respect to the Khosara *musical composition*.

7       The conclusion that Sout El Phan had no derivative works right in the

8   Khosara composition to license to EMI Music Arabia is confirmed by the certificate

9   of Sout El Phan's copyright interest in sound recordings, including Khosara, in the

10  Egyptian Copyright office, SACERAU. *See* Dec. 29, 1997 SACERAU Copyright

11  Certificate, Ex. C to Loutfi Decl. Sout El Phan's SACERAU certificate concerns

12  *sound recordings*. Loutfi Decl. ¶ 7. (SACERAU's records contain a *different*

13  certificate of Hamdy's copyright in the Khosara *musical composition. Id.* ¶ 6.) The

14  Sout El Phan SACERAU certificate recites strict limitations:

15      "Sout El Phan Company is **not allowed to make any changes or
        modifications** as to its text or melody **or to take parts of it or to insert it
16      into another work** or to take cuts of it without obtaining a prior written
        consent from the author or his heirs."
17
    Loutfi Decl., Ex. C (emphases added); Loutfi Reply Decl. ¶ 12, Ex. A thereto. This
18
    provision reflects applicable Egyptian copyright law. The right to fundamentally
19
    change or modify a work cannot be transferred from the author in any blanket
20
    license. Thus, while Sout El Phan had the right to reproduce and distribute
21
    unaltered recordings of Khosara, it had no right to change or modify the Khosara
22
    musical composition, and could not sublicense any such right to EMI Music Arabia.
23
        The EMI Music Arabia Settlement Agreement. The last supposed link in
24
    Defendants' "license" chain of title that did not purport to convey any copyright
25

26  ⁸ In his Declaration, Dr. Zohny suggests that the License Agreement conveyed rights in
27  recordings "as well as the compositions embodied in these recordings." Zohny Decl. ¶ 16. This
    opinion is merely an *ipse dixit*. Dr. Zohny did not identify any provision of the License
28  Agreement that pertains to "compositions."

1 interest of any kind, to anyone. Specifically, Defendants purport to rely upon a
2 March 30, 2001 *settlement agreement* between Timothy Mosely and EMI Music
3 Arabia. EMI Music Arabia – which Defendants now claim was supposedly the
4 *sublicensor* of rights – is on record emphatically *disavowing* that the settlement
5 agreement was *any kind* of license. In the *Nafal* case, Adrian Cheesley, who was
6 EMI Music Arabia's General Manager and then Managing Director between 1998
7 and 2005, submitted a Declaration about the settlement agreement between EMI
8 Music Arabia and the Mosely Entities. His declaration unequivocally shows: There
9 is not now, nor has there ever been, a license agreement for Khosara Khosara
10 between EMI Music Arabia and the Mosely Entities. *See* Plaintiff's Request for
11 Judicial Notice, and Lear Decl. Ex. 2, ¶ 3 (Jan. 30, 2006 Declaration of Adrian
12 Cheesley). The Court can also see for itself that what Mr. Cheesley had to say about
13 the settlement agreement is true: it is a release, not a license. *See* Ex. 1 to Lewis
14 Declaration (lodged for filing under seal).

15 As with all of the other documents Defendants rely upon, there is absolutely
16 no language in the settlement agreement that purports to "sublicense" any right to
17 make derivative works of the Khosara musical composition.

18 Other Documents Relied Upon By Defendants. Defendants purport to rely on
19 additional documents *outside* the chain of title, as if they might make a difference.
20 They do not, for reasons discussed below.

21 Most of these documents are unauthenticated hearsay, and are irrelevant. But
22 even if the Court were to consider them as evidence, they do not show the existence
23 of any genuine issue for trial. First, none of these documents change Egypt law, that
24 no right to make fundamental changes or modifications of the Khosara musical
25 composition could be assigned away by the author or his heirs. Second, none of
26 these documents contains any language purporting to generally license any such
27 right (which is not surprising, since an attempted license would have been void).

28 For example, Defendants point to a November 12, 2002 "Authorization" in

-18-

1  which Mr. Fahmy granted certain rights to Mohsen Mohammad Jaber. Zohny Decl.,

2  Ex. 10. Even according to Defendants, this is "the same contract that was existing

3  with Sout El Phan." *Id.* ¶ 19. Thus, Defendants implicitly admit that the 2002

4  Authorization adds *nothing* to their arguments. Moreover, the 2002 Authorization

5  could not trump Egypt law, and make a license of the right change or modify the

6  Khosara musical composition valid. No provision in the 2002 Authorization

7  purports to license any such right. Loutfi Reply Decl. ¶ 12; Fahmy Decl.¶¶8-9.

8           4.      Defendants' Other Arguments Are Contrary To Law.

9                        a.      Whether Defendants "Changed" The Character Of
                                 Khosara, When They Prepared Unauthorized Derivative
10                               Works, Is Directly Relevant Under Both Egypt Law And
                                 US Copyright Law.

11       Defendants argue – with no citation to any authority – that "[w]hether or not

12  the use of *Khosara Khosara* at issue in this case amounts to a 'change' or

13  'modification' is irrelevant under U.S. law." Opp. 18:16-17. The argument fails.

14       First, *Egypt* law governs the question of what rights in Khosara could

15  effectively be transferred. As we explained above, under *Eygpt* law, Defendants

16  could not have acquired any blanket license, in advance, that empowered them to

17  make any derivative work they wished based on Khosara, or otherwise make at will

18  any changes or modifications to the composition.

19       Second, Defendants' argument is directly contrary to US copyright law in any

20  event. Section 115 of the Copyright Act provides for compulsory licenses for

21  "cover" sound recordings of musical compositions that have been distributed to the

22  public. 17 U.S.C. § 115. A person is allowed to make a limited form of derivative

23  work – *i.e.*, a new "musical arrangement" of a work previously released in

24  phonorecords (*see* 17 U.S.C. § 115(a)(2)) – if that person complies with the notice

25  and royalty provisions of Section 115. But the kind of derivative "musical

26  arrangement" that is permitted by Section 115 is *strictly limited*. Arrangements are

27  permitted *only* "to the extent necessary to conform it to the style or manner of

28

-19-

1   interpretation of the performance involved." 17 U.S.C. § 115(a)(2). The

2   "arrangement" *may not*, however, "change the basic melody or fundamental

3   character of the work … except with the express consent of the copyright owner."

4   *Id.* Arrangements that *do* change the fundamental character of the underlying work

5   – without the "express consent" of the copyright owner – are *not* protected as

6   derivative works, and are *infringing*.

7       Third, as we explain in the next section, whether a "change" or

8   "modification" has been made in a new work is directly relevant to the question of

9   whether the right that is being exercised in exploiting the new work is the

10  "reproduction" right under 17 U.S.C. § 106(1) or the "derivative works" right under

11  17 U.S.C. § 106(2). The "reproduction" and "derivative works" rights are *distinct*;

12  the license of one is *not* the license of the other. Modern Licensing Law § 6:22.

13                  b.      Defendants Did Not Merely "Reproduce" Khosara; They
                            Prepared Unauthorized "Derivative Works."

14      The Opposition suggests that Plaintiff "has alleged that Defendants have

15  copied, without change, *Khosara Khosara*" and "[t]hat is the exercise of the

16  economic right of reproduction." Opp. 18:18-19. Dr. Zohny also suggests that

17  Defendants made only a "reproductive" sample. The arguments fail for two reasons.

18      First, Plaintiff does not claim that Defendants "copied" Khosara without

19  changing it. Rather, Plaintiff explicitly alleges that Defendants made infringing

20  "derivative works." Complaint ¶¶ 4, 21, 28, 34. And, as a matter of law, the term

21  "copy" in copyright parlance means to violate *any* of the exclusive rights of the

22  copyright owner listed in 17 U.S.C.§ 106. *S.O.S.*, 886 F.2d at 1085 n. 3.

23      Second, Defendants' argument ignores the difference between the

24  "reproduction" right and the "derivative works" right – which are *distinct* under 17

25  U.S.C. § 106. "The reproduction right consists of the exclusive right 'to reproduce

26  the copyright work in copies or phonorecords.' 'Copies' and 'phonorecords' consist

27  of material objects in which the work is fixed. *It is only the reproduction of such*

28

-20-

PLAINTIFF'S MEMO. Ps&As IN SUPPORT OF MOTION FOR ORDER SPECIFYING MATERIAL FACTS AND
ISSUES OF FOREIGN LAW THAT EXIST WITHOUT SUBSTANTIAL CONTROVERSY

1   *material objects that is encompassed in the reproduction right*." M. Nimmer,

2   *Nimmer on Copyright* § 8.02[A] (emphasis added); *see also* 17 U.S.C. § 101

3   (defining "copies" and "phonorecords"). Here, the work allegedly infringed is a

4   musical composition. Such works are fixed in tangible form either in a musical

5   score (*e.g.,* music notation on paper), or the first phonorecord of the work.[9]

6   Exercise of the right to "reproduce" Khosara would involve *only* the making of a

7   new physical copy of the original. There is no claim in this case that Defendants

8   infringed Plaintiff's copyright only by "reproducing" – *i.e.*, making identical

9   "copies" or "phonorecords" – of any material object in which Khosara was first

10  fixed in tangible form.

11       Instead, this case concerns the unauthorized preparation of derivative works.

12  A "derivative work" is created when a *new* work is "based upon one or more pre-

13  existing works." 17 U.S.C. § 101. Examples of a derivative work explicitly include

14  a "musical arrangement" or a new "sound recording" of a pre-existing work. *Id.*

15  That is what is involved here. Defendants created *new* sound recordings (not a

16  physical copy of an existing phonorecord) constituting new "musical arrangement"

17  based upon Khosara, but fundamentally modifying it with new lyrics and music. No

18  one can seriously assert that when Defendants released multiple new sound

19  recordings of Big Pimpin' – with dramatically different lyrics, and rap and heavy

20  metal themes – they merely "reproduced" a material object in which Khosara was

21  first fixed.[10]

---

[9]  "A musical composition may be embodied in sheet music, on an audiotape, on a compact disc, on a computer hard drive or server, or as part of a motion picture soundtrack. In each of the fixations, the intangible property remains a musical composition." W. Patry, Patry on Copyright § 3:22.

[10]  Defendants misplace their reliance on dictum in a footnote in the factually inapposite case of *Freeplay Music, Inc. v. Cox Radio, Inc.*, 409 F.Supp.2d 259, 262 n. 1 (S.D.N.Y. 2005). *See* Opp. p. 18. *Freeplay* did not address any issue presented in this case. Notably, however, immediately after the language that Defendants quoted from *Freeplay*, it cited with favor *Bridgeport Music, Inc. v. Dimension Films*, 410 F.3d 792 (6th Cir. 2005), which recognized that the producer of a sound recording needs separate authorization from the owner of copyright in the underlying musical composition. *Id.* at 801, n. 8 ("the imitator would have to clear with the owner of the composition copyright").

1    What Defendants must show is that they acquired the right to prepare

2  derivative works based upon Khosara.  There is insufficient to create any genuine

3  issue that they lawfully received that right.  Plaintiff's Motion should be granted.

4  **III.  DEFENDANTS' PROCEDURALLY IMPROPER REQUEST FOR
       DISMISSAL IS BASED ENTIRELY UPON A STRAW MAN
5      ARGUMENT THAT IS IRRELEVANT, AND THAT IS DEVOID OF
       MERIT IN ANY EVENT.**

6
           **A.    No Motion For Dismissal Or For Any Ruling On Questions Of
7                  Subject Matter Jurisdiction Is Properly Before The Court.**

8    Defendants first raised their arguments regarding supposed lack of subject

9  matter jurisdiction in their Opposition to the present motion.  Defendants did not

10 meet and confer with Plaintiff as required by L.R. 7-3, and no separately-noticed

11 motion to dismiss is before the Court.  Accordingly, Plaintiff has been denied any

12 full and fair opportunity to respond.  Defendants should not be allowed to prejudice

13 Plaintiff by springing the jurisdictional issue, by surprise, in the context of another

14 proceeding that itself presents complex issues.  This Reply must focus on issues that

15 are properly before the Court on Plaintiff's own motion.  Where only a small

16 fraction of a Reply is available to respond to a request for *sua sponte* dismissal, it is

17 manifestly unfair.  The Court should not countenance Defendant's ambush.  In any

18 event, Dr. Loutfi explains that Egypt law does not provide that the author's

19 inalienable right to control and authorize modifications and changes to a copyright

20 work is limited to Egypt, while other rights are not.  Reply Decl. of Dr. Loutfi, ¶ 10,

21 filed herewith. It is absurd to argue defendants' infringements *in the US* can only be

22 redressed in Egypt, a forum that obviously lacks jurisdiction over Defendants.

23         **B.    Contrary To Defendants' Arguments, Plaintiff Does Not Base His
                  Affirmative Claims For Relief Upon Egypt's "Moral Rights" Law;
24                Plaintiff's Claims Arise Under The 1976 Copyright Act, And This
                  Court Has Jurisdiction Of Those Claims.**
25
                 1.    The Complaint Explicitly Alleges Violation Of Exclusive Rights
26                     Protected By The Copyright Act Of 1976; Defendants'
                       Suggestion That The Court Lacks Subject Matter Jurisdiction
27                     Over These Claims Is Frivolous.

28    The Complaint plainly alleges: "This is an action for copyright infringement

-22-

1  arising under the Copyright Act, 17 U.S.C. §§ 101 *et seq.*" Complaint ¶ 1. The

2  claims rest generally upon infringing exploitation of "derivative works." *Id.* ¶ 3. A

3  number of separate "Big Pimpin" works were created by adding fundamentally

4  different, profane lyrics, and fundamentally different musical themes to Khosara –

5  i.e., by creating a derivative work of the Khosara composition. *Id.* ¶ 12. Several

6  other works derivative of Khosara are also alleged to have infringed Plaintiff's

7  exclusive rights under the Copyright Act. *Id.* ¶ 14. And the Complaint explicitly

8  alleges *three* Claims for Relief for Copyright Infringement. *Id.* ¶¶ 19-37.

9      Under black letter law, the federal district courts have exclusive subject

10  matter jurisdiction for copyright infringement claims arising from acts occurring in

11  the United States. 28 U.S.C. §§ 1331, 1338; *Richlin v. Metro-Goldwyn-Mayer*

12  *Pictures, Inc.*, 531 F.3d 962, 966 (9th Cir. 2008), *cert. denied*, 129 S.Ct. 1002 (2007)

13  ("28 U.S.C. 1338 … confers subject matter jurisdiction over copyright actions").

14  Any suggestion to the contrary is frivolous.

15                 2.    Issues Of Moral Rights Under Egypt Law Have Arisen With

16                      Respect To The Copyright Claims *Only* Because Of Defendants'
*Affirmative Defense* – *i.e.*, An Alleged License Obtained
Through A Chain Of Title Originating in Egypt.

17      That Hamdy or his heirs have moral rights in "Khosara" under Egypt law is

18  not an element of Plaintiff's copyright claims. Copyright infringement has two

19  elements: (1) Plaintiff's ownership of a valid copyright; and (2) Defendants'

20  copying of original elements from the copyrighted work without authorization.

21  *Feist Publications*, 499 U.S. at 361. Proving that Plaintiff is the owner of moral

22  rights in "Khosara," and that those moral rights were violated, is not one of those

23  elements. Thus, it is just nonsense for Defendant to suggest that Plaintiff is

24  affirmatively seeking relief in this forum under Egypt's moral rights law.

25      Moral rights have become an issue only because *Defendants* have made it

26  one, by asserting a license *affirmative defense*. *Defendants* claim to hold a license

27  through a convoluted chain of title, the first link of which is a conveyance of certain

28

-23-

1 | rights by Hamdy to Sout el Phan, in Egypt. Plaintiff relies on Egypt's moral rights
2 | law *in rebuttal* – to explain why Defendants cannot, and do not, have any license
3 | that includes the right to make derivative works that are based on and
4 | fundamentally change the Khosara musical composition. These principles of
5 | Egyptian moral rights law are *not* an element of Plaintiff's own case in chief. Thus,
6 | any argument that Plaintiff's is making an affirmative "moral rights" claim collapses
7 | like a house of cards.

8
9

3. Plaintiff's Claims Are Deeply Rooted In Settled Principles Of US Copyright Law Regarding A Copyright Owner's Right To Control The Creation And Exploitation Of Derivative Works.

10 | Contrary to what Defendants' Opposition suggests, US law is not hostile to
11 | providing protection for rights of authors that are *in the nature* of moral rights. Both
12 | Congress and respected commentators have recognized that the exclusive right of a
13 | copyright owner under 17 U.S.C. § 106(2) to prepare derivative works is in some
14 | ways similar to what other countries recognize as the author's moral right of
15 | integrity. Just because protecting the derivative works right under Section 106(2)
16 | might have the effect of also protecting what other countries recognize as an
17 | author's right of integrity does not mean that a claim based upon Section 106(2) is
18 | any less viable, or appropriate, under US copyright law.

19 | The US became a signatory of the Berne Convention in 1988, through the
20 | Berne Implementation Act. Pub. L. No. 100-568. Congress did not include new
21 | provisions recognizing moral rights at that time, however, because Congress found
22 | that "a composite of laws" in the US *already* "provide[d] the kind of protection
23 | envisioned by Article 6 *bis*" of the Berne Convention. H.R. Rep. No. 609, 100th
24 | Cong., 2d Sess. 32-34 (1988); *see also* S. Rep. No. 352, 100th Cong., 2d Sess. 9-10
25 | (1988), 1988 U.S.C.C.A.N. 3706, 3714-15 (same). As notable specific examples,
26 | the House cited "[f]ederal laws includ[ing] 17 U.S.C. § 106, relating to **derivative**
27 | **works**," and "17 U.S.C. § 115(a)(2), relating to **distortion of musical works** used
28 | under the compulsory license respecting sound recording." *Id.* (emphases added).

-24-

1  Commentators confirm the overlap with §106(2)'s derivative works right:

2  "Although the Copyright Act is designed primarily to protect the economic rather than the personal interests of copyright owners, it *inevitably*

3  protects certain characteristics of those personal interests encompassed in the doctrine of moral rights. The rights conferred by the Copyright Act to …

4  *prepare derivative works … resemble* aspects of the rights to … *modify a work* under the doctrine of moral rights. In certain instances the unauthorized

5  alteration of a work conceivably may violate the author's exclusive rights under § 106 of the Copyright Act *to prepare a derivative work* or to display

6  the work to the public. Further, *an unauthorized alteration may be deemed to exceed rights conferred in a transfer or license of a copyright interest.*" 3

7  Entertainment Law 3d: Legal Concepts and Business Practices § 20:41 (emphases added).

8  "[A] claim of infringement may be available in many instances where the artist is complaining of what can otherwise be referred to as moral rights."

9  6 Lindey on Entertainment, Publ. & Arts § 16:100 (3d ed) (citations omitted). "[T]he economic right to create derivative works may be used to

10  prohibit the publication of unauthorized modifications of the author's work, which is the main concern of the moral right of integrity." R. Rigamonti,

11  *Deconstructing Moral Rights*, Harvard Int'l L.J., Vol. 47, No. 2, 353, 368 (Summer 2006)).

12  Here, Plaintiff has shown that, under Egypt law, any license that Defendants

13  claim to have could not have included, and did not include, any right to create

14  derivative works that fundamentally altered the Khosara musical composition.

15  Plaintiff thus retained ownership of the exclusive derivative works right that Section

16  106(2) explicitly recognizes, and the violation of that right is actionable under the

17  Copyright Act. This Court has subject matter jurisdiction of Plaintiff's claims.

18  Notably, Defendants have not cited a single case that dismissed viable claims

19  for infringement of the derivative works right under Section 106(2) of the Copyright

20  Act merely because that derivative works right under US law is similar to, or

21  overlaps, the moral right of integrity that is recognized abroad.

22  **IV.  CONCLUSION.**

23  For all of the foregoing reasons, the Court should grant Plaintiff's motion.

24

25  Dated: January 17, 2011                    CENTURY LAW GROUP LLP

26

27                                            By /s/ Edward O. Lear
                                                 Edward O. Lear
                                                 Attorneys for Plaintiff
28                                               OSAMA AHMED FAHMY

-25-