BROWNE GEORGE ROSS LLP
Peter W. Ross (State Bar No. 109741)
  pross@bgrfirm.com
Keith J. Wesley (State Bar No. 229276)
  kwesley@bgrfirm.com
2121 Avenue of the Stars, Suite 2400
Los Angeles, California 90067
Telephone: (310) 274-7100
Facsimile: (310) 275-5697

Attorneys for Plaintiff
Osama Ahmed Fahmy

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| Osama Ahmed Fahmy, an individual, | Case No. 07-CV-05715 CAS (PJWx) |
| Plaintiff, | The Hon. Christina A. Snyder |
| vs. | **PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR RECONSIDERATION OF SUMMARY JUDGMENT ORDERS BASED ON THE DOCTRINE OF LACHES** |
| Jay-Z (aka Shawn Carter), Timothy Mosely, Kyambo Joshua, Rob Bourdon, Brad Delson, Mike Shinoda, Dave Farrell, Joseph Hahn, Chester Bennington, Big Bad Mr. Hahn Music, Chesterchaz Publishing, EMI Blackwood Music, Inc., EMI Music Publishing Ltd., Kenji Kobayashi Music, Lil Lulu Publishing, Machine Shop Recordings, LLC, Marcy Projects Productions II, Inc., MTV Networks Enterprises Inc., Nondisclosure Agreement Music, Paramount Home Entertainment, Inc., Paramount Pictures Corporation, Radical Media, Rob Bourdon Music, Roc-A-Fella Records, LLC, Timbaland Productions, Inc., UMG Recordings, Inc., Universal Music and Video Distribution, Inc., and Warner Music Inc., | Date:    July 21, 2014<br>Time:    10:00 a.m.<br>Crtrm.: 5 |
| Defendants. | |

454812.1

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

1.   The Parties Agree on Two Things.........................................................1

2.   The "Undisputed Facts" Cannot Bar "Equitable Relief" At The Outset. .........2

   A.   Under *Petrella*, Equitable Relief Can be Dismissed Prior to Trial Based on Laches Only in "Extraordinary Circumstances", Which are Not Present in this Case.......................................3

      (1)   *Petrella* authorizes pre-trial dismissal of claims for equitable relief on the basis of laches solely in "extraordinary circumstances". ..............................3

      (2)   This case does not fit within *Petrella*'s description of "extraordinary circumstances" justifying dismissal of equitable relief at the outset...........................5

3.   Defendants' Application of the Remedial Stage Factors is Flawed.................7

   A.   There is Zero Evidence of Defendants' Reliance. ...................8

   B.   Defendants' Investments are Protected by the Separate Accrual Rule and Section 504(b).................................11

   C.   Plaintiff Presented Reasonable Explanations for the Timing of the Filing of the Suit.................................12

   D.   The Production of Discovery Related to Concert Revenue is Neither Special Nor Unique, and Certainly Not Cause for Dismissal of Plaintiff's Claim for Wrongful Profits...........................14

   E.   The Evidentiary Prejudice Claimed by Defendants is Inadequate to Bar Plaintiff's Claims for Wrongful Profits and Injunctive Relief. ..................................17

4.   Bifurcation is Inappropriate.................................19

5.   Conclusion...................................................24

1

## <u>TABLE OF AUTHORITIES</u>

2

<u>Page(s)</u>

3

<u>CASES</u>

4

*Burns v. Imagine Films Entertainment, Inc.*,
    164 F.R.D. 589 (W.D.N.Y. 1996) ....................................................16

5

6

*Caffey v. Cook*,
    409 F. Supp. 2d 484 (S.D.N.Y. 2006) ............................................16

7

*Chirco v. Crosswinds Communities, Inc.*,
    474 F.3d 227 (6th Cir. 2007) .................................................2, 5, 6

8

9

*Frank Music Corp. v. MGM, Inc.*,
    772 F.2d 505 (9th Cir. 1985) ......................................................16

10

*Haas v. Leo Feist, Inc.*,
    234 F. 105 (S.D.N.Y. 1916) .........................................................6, 7

11

12

*John Middleton, Inc. v. Swisher Int'l, Inc.*,
    2004 WL 792762 (E.D. Pa. April 8, 2004) ...................................20

13

14

*Lambert Corp. v. LBJC Inc.*,
    2014 WL 2737913 (C.D. Cal. June 16, 2014) ...............................4

15

*McRoberts Software, Inc. v. Media 100, Inc.*,
    329 F.3d 557 (7th Cir. 2003) .......................................................22

16

17

*New Era Publications Int'l v. Henry Holt & Co.*,
    873 F.2d 576 (2d Cir. 1989) ..................................................2, 5, 6

18

19

*On Davis v. Gap, Inc.*,
    246 F.3d 152 (2d. Cir. 2001) .......................................................22

20

*Petrella v. Metro-Goldwyn-Mayer, Inc.*,
    __ S. Ct. __, 2014 WL 2011574 (May 19, 2014)
    ....................................................................................... Passim

21

22

*Petrella v. Metro-Goldwyn-Mayer, Inc.*,
    695 F.3d 946 (9th Cir. 2012) ....................................................9, 10

23

24

*Polar Bear Productions, Inc. v. Timex Corp.*,
    384 F.3d 700 (9th Cir. 2004) .......................................................22

25

26

*Spectra-Physics Lasers, Inc. v. Uniphase Corp.*,
    144 F.R.D. 99 (N.D. Cal. 1992) ...................................................20

27

28

-ii-

# TABLE OF AUTHORITIES

1

**(cont'd)**
**Page(s)**

2

3

*Sprinturf, Inc. v. Southwest Recreational Indus., Inc.*,
    2004 WL 96751 (E.D. Pa. Jan. 2004) .........................................................20

4

*Truswal Sys. Corp. v. Hydro-Air Engineering, Inc.*,
    813 F.2d 1207 (Fed. Cir. 1987) ...............................................................16

5

6

*Urband & Lazar Music Publishing, Inc. v. Carter*,
    2009 WL 799759 (E.D. La. Mar. 23, 2009) ...............................................16

7

8

*William Hablinski Architecture v. Amir. Constr., Inc.*,
    2005 WL 4658149 (C.D. Cal. Feb. 27, 2005) ......................................20, 21

9

*Windsor Indus., Inc. v. Pro-Team, Inc.*,
    87 F. Supp. 2d 1129 (D. Colo. 2000) .......................................................20

10

**STATUTES**

11

12

17 U.S.C.
    §504(b) .................................................................................11, 12, 16, 22
    §1117(a) ...............................................................................................5

13

14

Copyright Act .............................................................................................1, 2

15

Lanham Act .....................................................................................................5

16

**OTHER AUTHORITIES**

17

18

Fed. R. Civ. P.
    42(b) ....................................................................................................19
    56 .........................................................................................................5

19

20

Restatement (Third) of Restitution and Unjust Enrichment
    §4, Comment ...........................................................................................2

21

22

23

24

25

26

27

28

Plaintiff Osama Ahmed Fahmy ("Plaintiff") respectfully submits the following reply in support of his motion for reconsideration of summary judgment orders based on the doctrine of laches.  Dkt. 401 (hereinafter the "Motion").

1.    **The Parties Agree on Two Things.**

Let's start with the good news.  Defendants' Opposition, Dkt. 411 (hereinafter the "Opp"), confirms that the parties <u>agree</u> on two things:

- *Petrella* holds that the doctrine of laches cannot bar Plaintiff's claims for liability and actual damages under the Copyright Act.  Opp. at 1:19-20 (laches "may not bar recovery of 'damages' accrued within the statute of limitations period").

- Even under pre-*Petrella* law – where laches could bar a copyright claim – the Court deferred ruling on application of that doctrine for the period of June 2006 to the present until after Plaintiff has been able to obtain discovery on the issue of Defendants' intent.[1]  Opp. at 1:14-15, 20:9-11.

In other words, regardless of how this Court rules on the Motion, the case is headed to trial.  The only question is the scope of that trial.  And for the reasons explained in the Motion, and below, *Petrella* compels that the trial include Plaintiff's claim for a disgorgement of Defendants' wrongful profits from August

---

[1]   Defendants stated that the parties "engaged in certain 'willfulness' discovery prior to being referred to Magistrate Judge Woehrle for settlement purposes."  Opp. at n.1.  The discovery that Defendants reference is their production of documents that they feel are favorable to their defense.  *Id.*  Any other, potentially unfavorable discovery – *i.e.*, deposition testimony from Defendants, that Plaintiff could potentially use to help prove his claim – Defendants have categorically refused to provide or discuss.  Thus, discovery in this case has, in effect, been unilaterally stayed by Defendants since settlement talks ceased in late May.  *See* Dkt. 402-404.

31, 2004 to the present.[2]  Then, pursuant to *Petrella*, <u>if</u> the jury decides to award wrongful profits, this Court may, after the verdict, evaluate whether the amount of that award should be adjusted based on laches considerations.  After all, an award can only be adjusted after the award is actually made.  If there is no award, there can be no adjustment.

**2.      <u>The "Undisputed Facts" Cannot Bar "Equitable Relief" At The Outset.</u>**

Defendants begin their Opposition by contending that, under *Petrella*, a court may bar the "equitable relief" of wrongful profits and injunctive relief at the outset under two circumstances:  (a) where there are "extraordinary circumstances" such as those in *Chirco v. Crosswinds Communities, Inc.*, 474 F.3d 227 (6th Cir. 2007) and *New Era Publications Int'l v. Henry Holt & Co.*, 873 F.2d 576, 584-85 (2d Cir. 1989), <u>or</u> (b) "by examining a series of equitable considerations that need not rise to the level of 'extraordinary circumstances'".[3]  Opp. at 6:11-14.  Defendants' reading of *Petrella* is contrary to the plain language of that opinion and common sense.  In fact, *Petrella* held that only the rare cases that fall within category (a) justify a categorical pre-trial dismissal, and this case (like *Petrella*) is not such a case.

_____

[2]      Injunctive relief would of course be evaluated by the Court after trial.

[3]      Plaintiff does not agree that the remedy of wrongful profits is "equitable."  In fact, the Supreme Court said a recovery of wrongful profits "is not easily characterized as legal or equitable," for it is an 'amalgamation of rights and remedies drawn from both systems.'"  *Petrella v. Metro-Goldwyn-Mayer, Inc.*, __ S. Ct. __, 2014 WL 2011574, at *4 n.1 (May 19, 2014), quoting Restatement (Third) of Restitution and Unjust Enrichment §4, Comment b, p. 28 (2010).  However, in that the label given to an award of wrongful profits under the Copyright Act is irrelevant to this Court's ruling on the Motion, Plaintiff will not discuss that issue further herein.

A.   **Under *Petrella*, Equitable Relief Can be Dismissed Prior to Trial Based on Laches Only in "Extraordinary Circumstances", Which are Not Present in this Case.**

(1)   ***Petrella* authorizes pre-trial dismissal of claims for equitable relief on the basis of laches solely in "extraordinary circumstances".**

As explained at page 5, lines 6-19 of the Motion, *Petrella* held that the doctrine of laches remains applicable in copyright cases in only two instances. First, "in extraordinary circumstances," laches may bar equitable relief at the outset. Second, "[s]hould [the plaintiff] ultimately prevail on the merits, the District Court, in determining appropriate injunctive relief and assessing profits, may take account of her delay in commencing suit." *Petrella*, *supra*, at *14. The Supreme Court then listed factors the lower courts should take into account when conducting an analysis of whether to make an adjustment "at the remedial stage" to a wrongful profit award or injunctive relief – hereinafter the "Remedial Stage Factors". *Id.* at **13-14.

Defendants' position – *i.e.*, that a court may dismiss a wrongful profit or injunctive relief claim before trial based on the Remedial Stage Factors – is directly contrary to the plain language of *Petrella* and common sense. If Defendants' position were correct:

- Why would the Supreme Court have explained that the Remedial Stage Factors come into play only "[s]hould Petrella ultimately prevail on the merits", if it really meant that the Remedial Stage Factors can be applied before the merits are even considered (and before the plaintiff is permitted any discovery on the merits)? *Petrella*, *supra*, at *14;

- Why would the Supreme Court have said the Remedial Stage Factors could be invoked to make "adjustments . . . in awarding injunctive relief, and in accounting for MGM's gains and profits", *id.* at *14, if it

-3-

truly meant that district courts can wipe out those claims altogether
before a jury even considers the merits?

- Why would the Supreme Court have specified the "extraordinary
  circumstances" that "may be of sufficient magnitude to warrant, at the
  very outset of the litigation, curtailment of the relief equitably
  awardable", *id.* at *13, if courts can apply the (likely less stringent and
  more flexible) Remedial Stage Factors instead?

- Why would the Supreme Court have stated there is "little place" for the
  laches doctrine in copyright cases, *id.*, if courts can weigh the Remedial
  Stage Factors pre-trial and grant summary judgment based thereon?

- Why would the Supreme Court have noted that a plaintiff who waits to
  sue beyond the three-year statute of limitations "will miss out on
  damages for periods prior to the three-year look-back, but her right to
  prospective injunctive relief should, in most cases, remain unaltered",
  *id.* at *11, if injunctive relief could be stripped away by a court before
  trial through application of the Remedial Stage Factors?

Defendants' position not only distorts the meaning of the plain text of
*Petrella*, but also makes no sense from a practical perspective. That is so because
without knowing the existence, amount, or nature of the jury's award of wrongful
profits, it is impossible to assess whether the Remedial Stage Factors should be
applied to adjust the amount of that award. For example, is the award all of
Defendants' wrongful revenue, or a portion thereof, or only profits from the year
2014, or profits from June 2006 to the present, or something else? Without knowing
what, if anything, the jury awards in the form of wrongful profits, this Court cannot
evaluate whether and what "adjustments" to that award are necessitated by equity
due to the timing of the filing of the suit. *Cf. Lambert Corp. v. LBJC Inc.*, 2014 WL
2737913, at *5 (C.D. Cal. June 16, 2014) ("[S]ince the Court concludes that genuine

PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR RECONSIDERATION OF SUMMARY JUDGMENT
ORDERS BASED ON THE DOCTRINE OF LACHES

issues of material fact exist as to liability, the Court finds that defendants' arguments regarding what remedies are available to plaintiff are better addressed at a later stage in the proceedings.").[4]

In short, the only reasonable reading of *Petrella* is that laches can bar a claim for equitable relief before trial solely in "extraordinary circumstances," not based upon a court's application of the Remedial Stage Factors.[5]

### (2)   <u>This case does not fit within *Petrella*'s description of "extraordinary circumstances" justifying dismissal of equitable relief at the outset.</u>

The reason why Defendants attempt to re-write *Petrella* is obvious – they know that this case does not have the "extraordinary circumstances" justifying dismissal of equitable relief at the outset.  Plaintiff explained in his Motion why that is so.  Motion at 5:6-19, 7:15-8:18.  Defendants' attempts to argue or imply otherwise are cursory and weak.  Opp. at 4:21-6:10.

<u>First</u>, Defendants cite *Petrella*'s two examples of cases with "extraordinary circumstances" – *Chirco* and *New Era* – and note that both cases involved plaintiffs who delayed notifying the defendants of their claims until after the defendants had

---

[4]   The federal trademark act, the Lanham Act, has a post-trial procedure for evaluating whether wrongful profits should be adjusted.  17 U.S.C. §1117(a) ("If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case.").  That provision cannot be invoked before trial either; it instead comes into play solely after a trial in which the jury actually awards wrongful profits.

[5]   To be sure, Defendants are correct that Rule 56 of the Federal Rules of Civil Procedure authorizes courts to grant summary judgment before trial on remedies and affirmative defenses that cannot succeed as a matter of law.  Opp. at n.4.  But *Petrella* explains how to apply that rule when evaluating laches in a copyright case – *i.e.*, summary judgment on equitable relief in a copyright case is only appropriate when the undisputed facts show the existence of "extraordinary circumstances".

1  invested substantial time and money in producing and distributing the infringing

2  works.  But that fact did not make the cases "extraordinary"; indeed, it is a common

3  scenario in laches cases.  Rather, the truly extraordinary part of *Chirco* and *New*

4  *Era*, which Defendants ignore, was the effect certain relief requested by the

5  plaintiffs would have had on the defendants and third parties.  More specifically, the

6  relief the plaintiff was denied in *Chirco* was the destruction of homes that were

7  already built and had hundreds of occupants or soon-to-be occupants!  Similarly, the

8  relief the plaintiff was denied in *New Era* would have "resulted in the total

9  destruction of the work."  *Petrella*, *supra*, at *13.  Forcing hundreds of innocent

10 families to vacate their homes or totally destroying a work of literature is an

11 "extraordinary" result; disgorging profit made by infringers who continue to infringe

12 with impunity is not.

13        Moreover, Defendants ignore the fact that the *Chirco* court allowed claims for

14 injunctive relief and wrongful profits to proceed to trial, *Chirco*, 474 F.3d at 235-36,

15 and the *New Era* court allowed the claim for wrongful profits to proceed to trial.

16 *New Era*, 873 F.2d at 584-85.  In other words, *Chirco* and *New Era* do not compel

17 pre-trial dismissal of Plaintiff's claim for wrongful profit; rather, pre-trial dismissal

18 of Plaintiff's claim for wrongful profit would be directly <u>contrary</u> to *Chirco* and

19 *New Era* (and, by extension, *Petrella*).

20        <u>Second</u>, Defendants cite to *Haas v. Leo Feist, Inc.*, 234 F. 105 (S.D.N.Y.

21 1916).  But *Petrella* did not cite *Haas* as an example of a case involving

22 "extraordinary circumstances" justifying application of laches to dismiss wrongful

23 profit or injunctive relief claims at the outset.  Rather, *Petrella* cited *Haas* as an

24 example of a court acknowledging that wrongful profits could be <u>adjusted post-trial</u>

25 to take into account the equities.[6]  *Petrella*, *supra*, at *14.

---

[6]  *Haas* is also distinguishable in that, even post-trial, the plaintiffs maintained the right to recover all wrongful profits from the composer of the infringing work (footnote continued)

Third, Defendants note that "[e]xtraordinary circumstances" are not limited to the facts of the cases that *Petrella* described as "illustrative." No doubt. But *Petrella* gave those illustrations for a reason – *i.e.*, to demonstrate just how tiny is the "little place" still reserved for the doctrine of laches in copyright cases.

In sum, the circumstances of this case are nowhere close to those deemed "extraordinary" by *Petrella* and the cases cited therein. In fact, those authorities are directly contrary to Defendants' request that this Court may categorically dismiss Plaintiff's claims for wrongful profits and injunctive relief before trial. For that reason, Plaintiff's motion for reconsideration should be granted, and all wrongful profit from August 31, 2004 to the present should remain at issue in both discovery and at trial.

**3.    Defendants' Application of the Remedial Stage Factors is Flawed.**

The Court's analysis should end after reading the section above. Now is not the time to consider the Remedial Stage Factors, and doing so would be directly contrary to the letter and spirit of *Petrella*.

Nevertheless, Defendants go on to discuss those factors. Therefore, even though evaluating whether a non-existent and hypothetical award of wrongful profits should be adjusted based on the equities would seem to be an impossible, nonsensical exercise, Plaintiff will now respond to Defendants' application of the Remedial Stage Factors out of an abundance of caution.

_____

(Piantodosi); the limitation on the amount of wrongful profit solely applied to the innocent publishing house that had no knowledge of the copyright (Feist). *Hass*, 234 F. at 108. Here, unlike in *Haas*, Defendants ask the Court to leave Plaintiff with no wrongful profit remedy against any of them. Moreover, in *Haas*, before the defendants began exploiting the infringing song, the composer personally played it for one of the plaintiffs, who made no objection. *Id.* at 106. Before releasing *Big Pimpin'*, Jay Z and Timbaland did not extend the same courtesy to Plaintiff or anyone else involved in the creation of *Khosara Khosara*, and they continue to exploit it to this day.

A.     **There is Zero Evidence of Defendants' Reliance.**

The Supreme Court instructed district courts evaluating the Remedial Stage Factors to "closely examine [the infringer's] alleged reliance on [the copyright owner's] delay." *Petrella*, *supra*, at *14. As explained in Plaintiff's opposition to Defendants' motion for summary judgment, Dkt. 359 at 17:9-18:18:3, there is no evidence that Defendants relied on Plaintiff's delay in asserting his claim when they made investments related to the infringing work. Several of the defendants, including Jay Z, submitted no evidence of their states of mind (and thus no evidence that they relied upon Plaintiff's delay). *Id.* at 17:9-17. A few defendants at least tried to create a façade of reliance, but failed to claim actual reliance. For example:

- Some declarants stated they were unaware of Plaintiff's claims in the early 2000s, which is something far different from representing they conducted activities or made expenditures <u>in reliance upon</u> their presumed rights. (Sandsmark, ¶6, LiCalsi, ¶4.)

- Another declarant testified (without foundation) that she believed Paramount "<u>would have had the opportunity to take [Plaintiff's] claim into account</u>" when Paramount decided to enter into a distribution agreement. (McNicoll, ¶11) (emphasis added). That a defendant would have added the plaintiff's claim into its calculus is something far different from claiming it actually relied on the plaintiff's delay in asserting his claim.

- Another declarant opined (without foundation) that "[h]ad MTVN been informed of any such claim, let alone received a lawsuit, MTVN <u>could have</u> excluded or substituted Big Pimpin'/Papercut in the Program and in its agreement with WBR." (Horwitz, ¶5) (emphasis added). "Could", however, is far different than "would", and reliance requires the latter.

In fact, the declarations submitted on behalf of Defendants in support of summary judgment affirmatively show a lack of reliance.  For example, the Gawley Declaration states that "IDJ incurred over $3.5 million to manufacture 'Vol. 3' and over $4 million in distribution fees relating to that album through January 2009." (Gawley Decl., ¶6.)  This suit, however, was filed in August 2007.  The implication in the Gawley Declaration, therefore, is that Defendants continued to invest in the infringing work without regard to Plaintiff's claim.  After all, if the investments stopped upon notice of Plaintiff's claim in August 2007, then Mr. Gawley would not have referenced investments following that date.  The same logic and implication applies to other evidence submitted by Defendants.  (Hamilton Decl., ¶8) ("WBR paid for and incurred costs and expenses in connection with the manufacture of the 'Collision Course' album in excess of $4 million between 2004 and the end of 2011.").[7]

Pre-*Petrella*, this Court overlooked the evidentiary deficiencies described above.  This Court reasoned, based on the now vacated Ninth Circuit *Petrella* opinion, that "a defendant can demonstrate expectations based prejudice 'without any assertion that a defendant would have acted differently had the suit been filed sooner.'"  Dkt. 377 at 12, quoting *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 695 F.3d 946, 954 (9th Cir. 2012).  This Court also noted that there is a presumption of prejudice if a suit is not filed within the analogous statute of limitations, and

---

[7]   Indeed, this case has now been pending nearly seven years – *i.e.*, longer than Plaintiff's purportedly "unreasonable delay" in bringing suit.  Defendants have continued to infringe with impunity.  Jay Z is on tour as we speak, regularly performing the infringing work.  Plaintiff could have brought his claim a week after the release and Defendants would have continued to exploit the infringing work, just as they have continued to do throughout the seven years of this lawsuit (and the over nine years since the related *Nafal* case was filed).  Defendants know this, which is no doubt why not one of them was willing to declare that he or she would have acted differently had Plaintiff brought his claim sooner.

therefore <u>Plaintiff</u> had to prove that Defendants did <u>not</u> rely on the delay. *Id.* at 12 n.7. Finally, this Court explained that "the critical facts underlying expectations based prejudice – namely, the extensive investment of time, money, and energy by defendants – are not in dispute." *Id.*

The Ninth Circuit, however, "had taken a wrong turn in its formulation and application of laches in copyright cases." *Petrella, supra,* at *12, citing 695 F.3d at 959 (Fletcher, J., concurring.) Therefore, post-*Petrella,* this Court cannot disregard the evidentiary deficiencies described above.[8] This Court must "closely examine" Defendants' evidence of reliance, not assume that Defendants relied upon the delay simply because they expended a lot of money on projects related to the infringing work. *Petrella, supra,* at *14. Finally, there is no "presumption" of laches when the suit is brought more than three years after the infringement begins. Indeed, the delay in *Petrella* was much longer than the delay herein, and the defendant therein could not simply sit back and force the plaintiff to prove that there was no prejudice and that the delay was not reasonable. Rather, the Supreme Court eschewed a bright line rule and any presumption in favor of laches, holding instead that the doctrine of laches has little application in copyright cases and that the Remedial Stage Factors may be considered in their totality only after trial. *Id.*

In sum, if this Court were to "closely examine" evidence of Defendants' reliance, that evidence would evaporate. Defendants presented no evidence of actual reliance, and that key factor would counsel strongly against modifying any

---

[8]   Nor can the Court categorically deny Plaintiff the right to discovery on the issue of prejudice. For example, how can Plaintiff prove that Defendants did <u>not</u> rely on his purported delay in filing suit where Plaintiff has been denied the opportunity to depose Defendants on that subject? And how do we know Defendants are telling the truth when they say they did not know about or have the opportunity to consider Plaintiff's claim? Without discovery on those and other subjects related to prejudice, Plaintiff's hands have been tied for years. It is time to untie those knots and discover the truth.

1  award of wrongful profits or injunctive relief.

2        **B.**    **Defendants' Investments are Protected by the Separate Accrual**

3              **Rule and Section 504(b).**

4        Defendants also complain that they invested millions of dollars in promoting,

5  manufacturing, and distributing the infringing works.  Defendants' complaints are

6  specious because (a) the fruits of most of their investments – *i.e.*, pre-August 31,

7  2004 profit – cannot be touched due to application of the Copyright Act's three-year

8  statute of limitations, and (b) the investments are potentially deductible and/or a

9  basis for apportionment under Section 504(b).

10        More specifically, Defendants' expenditures can be divided into two

11  categories – (a) expenditures to create, manufacture, sell, and promote the infringing

12  work in the height of its popularity (*i.e.*, 1999 and 2000), and (b) expenditures

13  related to newer, derivative works, released in or around 2004 and 2005, which

14  incorporated the infringing work.  With regard to category (a), the three-year statute

15  of limitations – as applied using the "separate accrual rule" – protects the fruits of

16  those investments.  Under this Court's prior ruling, Plaintiff cannot receive a penny

17  of any of Defendants' profits from prior to August 31, 2004.  Furthermore, to the

18  extent that any of Defendants' post-August 31, 2004 profit is attributable wholly to

19  Defendants' investment, as opposed to copyright infringement, then that profit is not

20  disgorged either.  *Petrella*, *supra*, at *9, citing 17 U.S.C. §504(b).

21        With regard to the works referenced in category (b), Defendants are correct

22  that the statute of limitations does not present a temporal limitation on Plaintiff's

23  recovery.  There is a very simple and sensible reason for that – *i.e.*, Plaintiff sued

24  Defendants based on those works within the period of time Congress allotted.  In

25  other words, Congress deemed three years to be an acceptable period of time in

26  which to bring a copyright claim, and Plaintiff brought its claims based on

27  "Collision Course," "Fade to Black," and "Ultimate Mash-Ups" within that time

28

frame.  There is nothing unfair or unreasonable about the timing of Plaintiff's claims related to the works in category (b).  Moreover, as explained above, Defendants' investments are inherently taken into account, under Section 504(b), when disgorging profit.  When calculating wrongful profit, those sums (if proven) would be deducted from Defendants' gross revenue, and they could potentially form the basis of an apportionment of profit to factors other than copyright infringement.  17 U.S.C. § 504(b).

### C.   Plaintiff Presented Reasonable Explanations for the Timing of the Filing of the Suit.

Defendants ignore Plaintiff's explanations for the timing of his filing of this suit, and ridicule him for not suing them earlier.  Opp. at 7:7-10:2.  Defendants' arrows are misguided for multiple reasons.

First, some delay is present in every case involving a good-faith laches defense.  Indeed, in *Petrella*, the delay between the accrual of plaintiff's claim (1991) and the filing of the suit (2009) was more than double that delay herein.  The fact that Plaintiff did not file suit immediately does not make Defendants' laches defense in this case exceptional or force this case into that "little place" left for laches in copyright cases.  *Petrella*, supra, at *13.

In fact, *Petrella* clarified that "there is nothing untoward about waiting to see whether an infringer's exploitation undercuts the value of the copyrighted work, has no effect on the original work, or even complements it."  *Petrella*, *supra*, at *11. The Supreme Court expressly rebuked the harsh treatment extended by the Ninth Circuit towards copyright owners who had waited years to bring litigation.  *Id.*

Therefore, contrary to Defendants' intimations in their Opposition, Plaintiff should not be condemned for the timing of this suit.  There is nothing wrong with a copyright owner waiting years to determine whether litigation is necessary.  And to the extent the delay caused prejudice, the appropriate response is not wholesale

dismissal of a wrongful profit or injunctive relief claim; rather, it is to limit the plaintiff to a monetary recovery starting three years prior to the filing of the suit and then evaluate after trial whether the remedies should be adjusted based on the defendant's claimed prejudice.

Second, Plaintiff presented reasonable explanations for the timing of the filing of the suit, which cannot, post-*Petrella*, be rejected as a matter of law (and when viewing all evidence and inference in Plaintiff's favor).  For example:

- This Court, pre-*Petrella*, disregarded the fact that Plaintiff brought his claims – albeit through a representative deemed to lack standing – no later than April 1, 2005 through the filing of the *Nafal* case.  The basis of the Court's holding was that "the period of delay is measured by reference to the plaintiff's delay in initiating litigation, not the defendant's knowledge of the potential claims for infringement."  Dkt. 377 at 8.  But, according to *Petrella*, the timing of a defendant's knowledge is a factor that is relevant to application of laches.  *Petrella*, *supra*, at *14.  Thus, Defendants knew of Plaintiff's claim less than eight months after the start of the relevant damages period in this case – *i.e.*, August 31, 2004 – and the fact that Nafal lacked standing has no effect on Defendants' notice of Plaintiff's claim.  The *Nafal* case also provided Defendants the opportunity to conduct discovery on Plaintiff's claims, which, on the merits, are the same as those that were claimed by Nafal on Plaintiff's behalf.  Thus, the *Nafal* action is very significant to any effect of the delay on Defendants and who is primarily responsible for those effects.

- This Court, pre-*Petrella*, also rejected Plaintiff's explanations regarding the geographic, technological, and cultural barriers that inhibited Plaintiff from filing suit earlier.  This Court did so based, in part, on the

-13-

lack of legal authority showing that "a party's lack of business sophistication and familiarity with American society and legal practice can justify a delay in bringing suit." Dkt. 377 at 10. The Court also rejected the reasonableness of Plaintiff's reliance on others to prosecute his claims.[9] But, as explained *supra*, the Supreme Court implicitly rejected bright-line rules and instead invited courts to weigh "any other considerations that would justify adjusting injunctive relief or profits." Plaintiff submits that *Petrella* counsels in favor of including these considerations in the calculus and that, at the least, the Court should defer ruling on the reasonableness of Plaintiff's efforts until it actually evaluates Plaintiff's testimony in person, as opposed to in a written declaration.

In short, the delay in this case was neither egregious nor inexplicable. A reasonable juror, viewing all evidence and inferences in Plaintiff's favor, could find that Plaintiff provided reasonable explanations for the timing of the suit. Regardless, even if this Court still believed the delay is unreasonable, the default remedy described in *Petrella* – *i.e.*, limiting Plaintiff's monetary recovery to the statute of limitations period – is a more than adequate, equitable solution.

**D.** **The Production of Discovery Related to Concert Revenue is Neither Special Nor Unique, and Certainly Not Cause for Dismissal of Plaintiff's Claim for Wrongful Profits.**

Defendants' argument at page 13, lines 3-10 of the Opposition is truly

---

[9]   The Court found that "plaintiff has produced no evidence showing that he took any steps to ensure that [his representative] took any steps to prosecute the claims asserted in this action." Dkt. at 377. Plaintiff respectfully disagrees with that finding. *See* Dkt. 360 at Page ID#4901, Shimamoto Decl., Ex. C, Fahmy Decl., ¶10 ("I spoke with Mr. Sima periodically during this period. I would ask him how the infringement claim was coming along, and he would answer that it was coming along and would suggest that it was a time-consuming, lengthy process.").

remarkable.  Distilled to its essence, it goes as follows:  It's going to be a lot of work for us to defend ourselves against the plaintiff's claim for a portion of our concert revenue, so let's just forget altogether about that claim (which the Court has previously held to be legally cognizable).  Of course, the fact that a legally cognizable claim will be challenging to defend against is no ground for its dismissal.  There are other fundamental fallacies underlying Defendants' stance.

First, Defendants' assertion that "the Court has not even determined [concert revenues] are recoverable" is odd.  To the extent that Defendants mean that the Court did not determine whether concert revenue may be pursued at trial, Defendants are obviously wrong.  This Court specifically held, based on hornbook copyright law and Ninth Circuit precedent, that Defendants' profits from concerts at which the infringing work was performed are potentially recoverable as profit that is either directly or indirectly related to the infringement.  (Dkt. 309 at 10-16.)  To the extent that Defendants instead mean that the fact-finder has not yet determined whether to award concert revenue as wrongful profit, then their observation is irrelevant.  In almost all civil cases, discovery on damages must be produced before a court or jury has determined the defendant is even liable, let alone the type and amount of damage that will be awarded.  There is nothing unique about Defendants' discovery duties in this case.

Second, claiming that Plaintiff's recovery "would be truly a huge windfall . . . and disproportionate", Opp. at 13:9-10, is premature, to say the least.  Railing against the size of a judgment before the first witness takes the stand and before Defendants even disclose the amount of that revenue is plain silly.  Indeed, because Defendants have refused for years to produce their concert revenue, Plaintiff has been unable to produce that data to an expert to analyze the amount, if any, that will be claimed as wrongful profit.

Third, there is nothing unique or special about Defendants' obligations to

1  disclose their revenue related to the infringing work.[10]  In every copyright (or other

2  intellectual property case) involving a claim for monetary recovery, the defendant

3  must produce evidence of its revenue.  *See, e.g., Urband & Lazar Music Publishing,*

4  *Inc. v. Carter*, 2009 WL 799759, at **1-2 (E.D. La. Mar. 23, 2009) (in copyright

5  case involving alleged sampling of copyrighted work, granting motion to compel

6  rapper "Lil Wayne" to produce all revenue related to *Tha Carter III*); *Burns v.*

7  *Imagine Films Entertainment, Inc.*, 164 F.R.D. 589, 593 (W.D.N.Y. 1996) (in

8  copyright infringement case related to screenplay for movie *Backdraft*, court granted

9  motion to compel discovery of information related to defendants' profits from

10  Backdraft Attraction at Universal Studios Hollywood Theme Park); *cf. Truswal Sys.*

11  *Corp. v. Hydro-Air Engineering, Inc.*, 813 F.2d 1207, 1212 (Fed. Cir. 1987)

12  (rejecting argument that a patentee is not entitled to discover alleged infringer's

13  sales until after establishing right to an accounting).  And in every such case, the

14  defendant bears the burden of proving deductible costs and expenses because that

15  evidence is almost always in the defendant's sole possession.  17 U.S.C. § 504(b).

16  And in every such case, apportioning the profit attributable to the infringing work

17  versus the profit attributable to other factors involves estimation and inherent

18  imprecision.  *Frank Music Corp. v. MGM, Inc.*, 772 F.2d 505, 518 & n.11 (9th Cir.

19  1985) (collecting music copyright cases describing apportionment of wrongful

20  gain); *Caffey v. Cook*, 409 F. Supp. 2d 484, 503-509 (S.D.N.Y. 2006) (deducting

21  _____

[10]  Defendants' situation is unique and special in that they have managed to be
22  parties to intellectual property litigation for seven years without having produced
23  any discovery on, *inter alia*, their revenue from activities related to the allegedly
infringing works.  An accused infringer's relevant revenue is usually either
24  exchanged informally even before a suit is filed (*e.g.*, in response to a cease-and-
desist letter to evaluate settlement), or in the initial stages of discovery.  Defendants
25  should be thankful they have managed to avoid meaningfully participating in
26  discovery for the last seven years, not complain that they may finally have to abide
by the same rules as every other civil litigant.

27

28

expenses and estimating apportionment in wrongful profit case based on disgorgement of concert revenue).

Defendants' refrain that they face a special, unique burden in producing information regarding the money that they made rings hollow, and, regardless, is wholly irrelevant to the relief sought in the Motion.

**E.    The Evidentiary Prejudice Claimed by Defendants is Inadequate to Bar Plaintiff's Claims for Wrongful Profits and Injunctive Relief.**

Defendants also claim that evidentiary prejudice compels dismissal of Plaintiff's wrongful profit and injunctive relief claims.  For the reasons described *supra*, the "presumption" of prejudice no longer applies in copyright cases, and, regardless, wholesale dismissal of a wrongful profit and injunctive relief claim on the basis of the absence of one witness is inappropriate.

Categorical dismissal of Plaintiff's wrongful profit and injunctive relief claims is particularly inappropriate when considering the absent witness at issue herein.  The centerpiece of Defendants' evidentiary prejudice argument is the death of Magdi Amorousi.[11]  Mr. Amorousi is described by Defendants as a "key witness" and the "most important witness to one of Defendants' primary defenses", Opp. at 17:5-8, and his absence purportedly "infects Defendants' case for the entire period at issue, and has overwhelming equitable implications." *Id.* at 18:1-2.  Defendants' hyperbole knows no bounds.

In reality, it is hard to fathom that Plaintiff's purportedly unreasonable delay in filing suit was the cause of Defendants' loss of important evidence from Mr. Amorousi.  The Court previously found that Plaintiff knew of his claim by March 2001.  Dkt. 377 at 8.  According to Defendants, Mr. Amorousi passed away in or

---

[11]   Defendants also reference in passing other purported evidentiary prejudice. Plaintiff's response to those other arguments is set forth in its original opposition to summary judgment.  Dkt. 359 at 18:22-20:23.

around October 2002.  Thus, even if Plaintiff would have brought his claim within the three-year period authorized by Congress, Mr. Amorousi would have still been deceased prior to the filing of the suit.  Indeed, even if Plaintiff had acted quickly and filed suit sometime in 2001, it is highly unlikely Defendants would have had an opportunity to depose Mr. Amorousi before he passed.  That is because, in federal court, discovery does not usually even begin until months after the filing of the suit, and depositions do not usually occur until discovery is well underway.  In short, Plaintiff's purportedly unreasonable delay is not the reason there is no testimony from Mr. Amorousi.  His testimony would be unavailable even if Plaintiff had filed suit within the period of time deemed reasonable by Congress.

In addition, Defendants have not stated with any particularity the favorable evidence Mr. Amorousi would have purportedly given them.  They claim he had relevant information, but they assume that the information would have benefitted them rather than Plaintiff.  Why is that a reasonable assumption?  Is there any document or testimony from another witness that would lead to that inference or conclusion, particularly where all inferences must be viewed against Defendants?

Finally, the key transaction in which Mr. Amorousi participated was the agreement between Sout el Phan and EMI.  If the Sout el Phan representative is unavailable, then it would be reasonable to expect Defendants to at least try to obtain testimony from the other participant in the transaction – *i.e.*, EMI.  Defendants have not indicated they made any effort to do so.  Nor have they shown that the (unspecified) favorable evidence Mr. Amorousi possessed was unique to him.

In short, is it theoretically possible that if Plaintiff had sued Defendants immediately upon learning of potential infringement, Defendants could have located Mr. Amorousi in Egypt, served him with a subpoena, and deposed him before he passed?  Sure.  But what is the likelihood of that?  And, more importantly, what is

-18-

the likelihood that not only would Defendants have had the foresight to depose Mr. Amorousi before he passed, but they also would have elicited integral and favorable evidence that no one else at Sout El Pham or EMI possesses?  To dismiss an entire damages claim based solely on speculation regarding a series of highly unlikely events would fly in the face of equity (and *Petrella*).[12]

In sum, even under Defendants' unreasonable interpretation of *Petrella,* laches cannot bar Plaintiff's claims for wrongful profits or injunctive relief as a matter of law.

### 4.    <u>Bifurcation is Inappropriate.</u>

Defendants' alternative proposal is to bifurcate (a) liability and actual damages from (b) wrongful profits.  Defendants are correct that they propose an "unusual" procedure.  Plaintiff would go a step further.  Although Defendants say bifurcating actual damages from wrongful profits is "not unique", they cite no precedent for it, and Plaintiff has been unable to find any.  Regardless, Defendants' "unusual" request should be summarily rejected because Defendants failed to sustain their burden of proving the benefits of bifurcation in this case (none of which exist), and Defendants ignore the substantial burden and illogic of their proposal.[13]

The "separation of issues for trial is not to be routinely ordered."  Fed. R. Civ.

---

[12]   At the least, it is premature to determine the significance of Mr. Amorousi's absence.  It would be far more logical and equitable to view the evidence actually presented by Defendants – and how Mr. Amorousi's putative testimony would have fit within Defendants' actual case – as opposed to speculating as to Mr. Amorousi's importance before a single witness takes the stand.  This solution is particularly sensible here because, as explained *supra*, the case is proceeding to trial regardless of the outcome of the Motion.  Thus, Defendants will suffer no prejudice by waiting until after trial to evaluate the issue of evidentiary prejudice (as *Petrella* dictates anyway).

[13]   Defendants' request also fails as a procedural matter.  A party seeking relief must file a motion, not slip in a request for affirmative relief at the end of an opposition to a motion for reconsideration.

P. 42(b), advisory committee note.  Bifurcation requests of any sort (let alone the *sui generis* form proposed by Defendants herein) are routinely denied in intellectual property cases.  *See, e.g., William Hablinski Architecture v. Amir. Constr., Inc.*, 2005 WL 4658149, at **6-7 (C.D. Cal. Feb. 27, 2005) (denying motion to bifurcate trial of copyright claims); *John Middleton, Inc. v. Swisher Int'l, Inc.*, 2004 WL 792762, at **1-2 (E.D. Pa. April 8, 2004) (denying motion to bifurcate trademark and trade dress case); *Windsor Indus., Inc. v. Pro-Team, Inc.*, 87 F. Supp. 2d 1129, 1131 (D. Colo. 2000) (denying motion to bifurcate trade dress case).

The party requesting bifurcation "has the burden of proving that bifurcation is justified given the facts in this case."  *Spectra-Physics Lasers, Inc. v. Uniphase Corp.*, 144 F.R.D. 99, 101 (N.D. Cal. 1992).  To sustain that burden, the moving party must prove that bifurcation will "promote judicial economy and avoid inconvenience or prejudice to the parties."  *Id.*  Defendants failed to sustain their burden.

As a threshold matter, Defendants did not submit any <u>evidence</u> in support of their request.  Nor did they even attempt, in their memorandum of points and authorities, to specify – either qualitatively or quantitatively – the purported burdens they will have to bear absent bifurcation.  Defendants' conclusory, unsupported arguments are inadequate to sustain their burden of proving the necessity of bifurcation.  *Id.* at 101 (denying request for bifurcation of trial and discovery in patent case where moving party presented no evidence in support of request).

Furthermore, Defendants' argument is fatally flawed.  It can be summarized as follows:  (a) discovery and analysis of wrongful profits is burdensome on Defendants; (b) if the jury finds no liability, then Defendants could avoid that burden; thus (c) the Court should try liability and damages first to find out if the burden on Defendants is truly necessary.  Defendants' reasoning has been uniformly rejected by courts considering bifurcation requests.  *See, e.g., Sprinturf, Inc. v.*

1   *Southwest Recreational Indus., Inc.*, 2004 WL 96751, at *2 (E.D. Pa. Jan. 2004)

2   (rejecting similar argument because "the validation of this type of self-serving

3   argument, without more, would permit all defendants in all cases to sever liability

4   from damages"); *William Hablinski Architecture*, 2005 WL 4658149, at *6-7

5   (rejecting similar argument).

6          Moreover, the assumptions upon which Defendants' conclusion are based are

7   false.  More specifically, assumption (a) is that discovery and analysis of wrongful

8   profits is burdensome.  But, as described above, discovery related to wrongful

9   profits is not patently burdensome (and Defendants have not demonstrated the

10  burden in this particular case), and it is routinely required in intellectual property

11  cases.  In fact, participants in the music industry are particularly well-positioned to

12  produce historical revenue and profit data.  That is because of the commonality of

13  ongoing royalty payments in music.  Defendants track revenue and profit related to

14  the infringing work as a matter of course because they have to figure out the amount

15  of royalties that must be paid.  Thus, Plaintiff is simply asking for information that

16  Defendants regularly maintain anyway.  In fact, the irony is that Defendants have

17  already produced a substantial quantity of information related to their revenue and

18  profits.  They made that production for purposes of exploring settlement.  The only

19  burden they will bear related to the revenue and profit data previously produced is

20  sending an email responding to Plaintiff's request to permit the information to be

21  used for all purposes.[14]

22         Assumption (b) – *i.e.*, that Defendants can avoid having to produce their

23  revenue if the case is bifurcated according to their proposal – is also false.

24  _____

25  [14]  Oddly, Defendants have refused to permit Plaintiff to utilize the information in those materials for purposes of this case.  Thus, absent a motion to compel (which

26  Defendants will no doubt force Plaintiff to bring), Plaintiff has in its files some of the information it could use to support its claims, but Plaintiff cannot provide it to an

27  expert to start a damages analysis.

28

Defendants' relevant revenue and profit data is also relevant to Plaintiff's actual damages claim. That is so because one form of actual damages that may be available in a copyright case is hypothetical lost licensing fees. *Polar Bear Productions, Inc. v. Timex Corp.*, 384 F.3d 700, 709 (9th Cir. 2004) ("[I]t is not improper for a jury to consider either a hypothetical lost license fee or the value of the infringing use to the infringer to determine actual damages, provided the amount is not based on undue speculation."), quoting *McRoberts Software, Inc. v. Media 100, Inc.*, 329 F.3d 557, 566 (7th Cir. 2003); *On Davis v. Gap, Inc.*, 246 F.3d 152, 164-72 (2d. Cir. 2001) ("We conclude that Section 504(b) permits a copyright owner to recover actual damages, in appropriate circumstances, for the fair market value of a license covering the defendant's infringing use."). In other words, a copyright owner may be compensated in an amount equal to the licensing fee it should have received had Defendants not infringed. In order to calculate the amount of actual damages under a lost license fee framework, the percentage rate must be applied <u>to Defendants' revenues and/or profits</u>. Therefore, regardless of Plaintiff's claim for a disgorgement of wrongful profits, Plaintiff requires Defendants' financial statements in order to calculate its actual damages – a form of relief that even Defendants admit remains available. Defendants will bear the same "burden" even if the Court were to adopt their bifurcation proposal.

In addition, although Defendants have failed to sustain their burden of proving the benefits of bifurcation (which is reason alone to deny the request), the negative effects of Defendants' proposal are overwhelming. More specifically:

- The Court would be burdened with two trials, along with pre- and post-trial proceedings, thus doubling the time and expense of this case.
- Witnesses would be required to appear and testify twice. For example, Defendants' representatives on their revenue, profit, and apportionment would also have information relevant to Plaintiff's claims for actual

damage and liability.  As just one specific example, Jay Z has knowledge of whether he or other defendants actually copied Plaintiff's copyrighted work (relevant to liability), as well as the significance of the infringing work to his revenue streams (relevant to apportionment). Moreover, Plaintiff's experts on actual damages will be the same as his experts on wrongful profits.

- Plaintiff resides in Egypt.  He would be required to attend two trials, rather than one, which would result in substantial travel and lodging expenses and disruption in his daily life.

- Plaintiff would incur unnecessary, duplicative costs related to, for example, his own expert witnesses who must testify at trial twice rather than once, as well as depositions of Defendants' experts, who would be required to be deposed twice – once on liability and actual damages and once on wrongful profit.

- Issues related to liability and actual damages overlap substantially with issues related to wrongful profits – *e.g.*, amount of defendants' profit and revenue; the nature and type of infringing works at issue; evidence of the concerts, albums, and other media in which the infringing works were performed or distributed by Defendants.  Thus, the parties would be required to traverse the same ground in two different proceedings before two different juries.

Finally, the most glaring, fundamental reason for refusing to bifurcate this case is that it needs to get completed one way or another as soon as possible. Bifurcation will only result in more delay.[15]  *Petrella* was filed in 2009 and has been

_____

[15]   Bifurcation – and the resulting delay and uncertainty – also inhibits settlement discussions.  Why should Defendants seriously discuss settlement if they think they can delay a final resolution of this case for several more years?

PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR RECONSIDERATION OF SUMMARY JUDGMENT ORDERS BASED ON THE DOCTRINE OF LACHES

1  through discovery, an appeal to the Ninth Circuit, and an appeal to the Supreme
2  Court.  This case was filed two years earlier, and Plaintiff has had no opportunity to
3  depose a defendant.  Plaintiff does not bring this up to point fingers or complain
4  about past events.  It is simply the reality of this case, and that reality calls for all
5  involved – from the parties to counsel to the Court – to make getting the case to trial
6  their number one priority.  Defendants' bifurcation request would have the opposite
7  effect.  For that reason alone, it should be denied.  Like the thousands of other civil
8  cases currently pending in this Court – many of which involve far more onerous
9  discovery and complex fact patterns – this case should proceed through a single
10 discovery period and to a single trial, as soon as possible.

11 **5.    Conclusion.**

12       For the foregoing reason, Plaintiff respectfully requests that the Court grant
13 its motion for reconsideration, Dkt. 401.

14

15 DATED:  July 7, 2014                    BROWNE GEORGE ROSS LLP
                                          Peter W. Ross
16                                        Keith J. Wesley

17

18 By:  _____s/ Keith J. Wesley_____
                                              Keith J. Wesley
19
                                          Attorneys for Plaintiff Osama Ahmed Fahmy
20

21

22

23

24

25

26

27

28

PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR RECONSIDERATION OF SUMMARY JUDGMENT
ORDERS BASED ON THE DOCTRINE OF LACHES