BROWNE GEORGE ROSS LLP
Peter W. Ross (State Bar No. 109741)
  pross@bgrfirm.com
Keith J. Wesley (State Bar No. 229276)
  kwesley@bgrfirm.com
Christina J. Johnson (State Bar No. 228869)
  cjohnson@bgrfirm.com
2121 Avenue of the Stars, Suite 2400
Los Angeles, California 90067
Telephone: (310) 274-7100 / Facsimile: (310) 275-5697

Attorneys for Plaintiff
OSAMA AHMED FAHMY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| OSAMA AHMED FAHMY, an individual, | Case No. 2:07-CV-05715 CAS (PJWx) |
| Plaintiff, | **PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT ON DEFENDANTS' LICENSE AFFIRMATIVE DEFENSE; DECLARATIONS OF KEITH J. WESLEY AND LOUIS DIRINGER** |
| vs. | |
| JAY-Z (aka SHAWN CARTER), TIMOTHY MOSELY, KYAMBO JOSHUA, ROB BOURDON, BRAD DELSON, MIKE SHINODA, DAVE FARRELL, JOSEPH HAHN, CHESTER BENNINGTON, BIG BAD MR. HAHN MUSIC, CHESTERCHAZ PUBLISHING, EMI BLACKWOOD MUSIC, INC., EMI MUSIC PUBLISHING LTD., KENJI KOBAYASHI MUSIC, LIL LULU PUBLISHING, MACHINE SHOP RECORDINGS, LLC, MARCY PROJECTS PRODUCTIONS II, INC., MTV NETWORKS ENTERPRISES INC., NONDISCLOSURE AGREEMENT MUSIC, PARAMOUNT HOME ENTERTAINMENT, INC., PARAMOUNT PICTURES CORPORATION, RADICAL MEDIA, ROB BOURDON MUSIC, ROC-A-FELLA RECORDS, LLC, TIMBALAND PRODUCTIONS, INC., UMG RECORDINGS, INC., UNIVERSAL MUSIC AND VIDEO DISTRIBUTION, INC., AND WARNER MUSIC INC., | Judge:  Hon. Christina A. Snyder<br>Date:   March 30, 2015<br>Time:   10:00 a.m.<br>Crtrm.: 5<br><br>Pretrial Conference:<br>        April 27, 2015, at 11:00 a.m.<br>Jury Trial Date:<br>        May 12, 2015, at 9:30 a.m. |
| Defendants. | |

509358.2

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I. Introduction. ..................................................................................... 1

II. Summary Judgment Should Be Granted On Defendants' License Defense Because The Owners Of The *Khosara Khosara* Musical Composition Did Not Consent To The 2001 Settlement Agreement. .............. 2

    A. Defendants Do Not Dispute The Governing Law. ................. 2

    B. There Is No Evidence That The Owners Of *Khosara Khosara* Consented To The 2001 Settlement Agreement. ................... 3

    C. Defendants' Potential Alternative Argument Is Unfounded In Law And Evidence. ................................................................ 5

III. There Is No Admissible Evidence That EMI Arabia's Rights In *Khosara Khosara* Extended Beyond June 10, 2007. ........................ 8

    A. The 1995 EMI Arabia/Sout el Phan Agreement Was Not Renewed. ................................................................................ 8

    B. None Of Defendants' Other Arguments Is Persuasive. ........................ 9

IV. Defendants Did Not Receive A Valid License Of The Right To Publicly Perform *Khosara Khosara* At Concerts. ................................... 9

V. Defendants' "Motion" For *Sua Sponte* Dismissal Should Be Denied. ........... 10

    A. The "Motion" Is Procedurally Improper. .............................. 11

        (1) Statutory standing is not jurisdictional. ..................... 11

        (2) The "motion" is an improper and untimely motion for reconsideration. ............................................................ 12

        (3) The "motion" is untimely under the scheduling order. .............. 12

        (4) Rule 12(b)(1) is inapplicable. .................................... 13

    B. Defendants Are Judicially Estopped From Claiming Plaintiff Lacks Standing. ................................................................... 13

        (1) The doctrine of "judicial estoppel" bars a party from taking inconsistent positions in the same or different cases. ....... 13

        (2) Judicial estoppel bars Defendants' argument. ........................... 14

            (a) Defendants took clearly inconsistent positions. ............... 14

            (b) Defendants succeeded with their earlier position ............. 15

509358.2

-i-

1

2

**TABLE OF CONTENTS**
**(cont'd)**

**Page**

3

4

      (c)     Defendants would derive an unfair advantage or impose an unfair detriment if not estopped...................16

5

6

C.    Plaintiff Has Standing Because He Is A Legal Or Beneficial Owner Of Exclusive Rights Protected Under United States Copyright Law. ...................................................17

7

    (1)    Standing is evaluated under the 1909 U.S. Copyright Act.........17

8

    (2)    A copyright owner who licenses certain rights continues to have standing to sue under the 1909 U.S. Copyright Act. .........17

9

10

    (3)    Egyptian law controls whether Plaintiff has any ownership rights in the *Khosara Khosara* copyright. ................................18

11

    (4)    Under Egyptian law, an author cannot assign away his entire interest in a copyright. ......................................18

12

13

    (5)    Even if Plaintiff could have transferred all of his ownership interest in *Khosara Khosara*, he did not do so. ........19

14

15

      (a)     An author retains all rights in his copyright that are not explicitly and clearly transferred...............................20

16

      (b)     The 2002 Agreement is an authorization to make certain uses, not a conveyance of all right and title. ........20

17

18

      (c)     There is no explicit and clear transfer of ownership of the right to make derivative works from the work. .....21

19

20

      (d)     There is no explicit and clear transfer of the right to publicly perform the work................................................22

21

22

      (e)     Plaintiff intended to convey only the right to use the *Khosara Khosara* composition in a particular sound recording to be used and sold on tapes, CDs, etc.............24

23

24

25

26

27

28

-ii-

PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT ON DEFENDANTS' LICENSE AFFIRMATIVE DEFENSE; DECLARATIONS

1

# **TABLE OF AUTHORITIES**

2

**Page(s)**

3

### **FEDERAL CASES**

4

*Ariel (UK) Ltd. v. Reuters Group PLC*,
   U.S. Dist. LEXIS 79319 (S.D.N.Y. Oct. 31, 2006) ......................................4, 5, 21

*Autohaus Brugger, Inc. v. Saab Motors, Inc.*,
   567 F.2d 901 (9th Cir. 1978) ....................................................................................9

*Fishman v. LaSalle Nat'l Bank*,
   247 F.3d 300 (1st Cir. 2001) ..................................................................................24

*Gardner v. Nike, Inc.*,
   279 F.3d 774 (9th Cir. 2002) ....................................................................................5

*Gilliam v. ABC, Inc.*,
   538 F.2d 14 (2d. Cir. 1976) ..........................................................................8, 9, 19

*Harris v. Emus Records Corp.*,
   734 F.2d 1329 (9th Cir. 1984) ..................................................................................5

*Hyperquest, Inc. v. N'Site Solutions, Inc.*,
   632 F.3d 377 (7th Cir. 2011) ..................................................................................11

*Itar-Tass Russian News Agency v. Russian Kurier, Inc.*,
   153 F.3d 82 (2d Cir. 1998) ....................................................................................18

*Jules Jordan Video, Inc. v. 144942 Canada, Inc.*,
   617 F.3d 1146 (9th Cir. 2010) ................................................................................24

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
   134 S. Ct. 1377 (2014) ............................................................................................11

*Love v. The Mail on Sunday*,
   2006 WL 4046180 (C.D. Cal. Aug. 15, 2006) ........................................................23

*Manning v. Miller Music Corp.*,
   174 F. Supp. 192 (S.D.N.Y. 1959) ..........................................................................17

*Miller v. Glenn Miller Productions, Inc.*,
   454 F.3d 975 (9th Cir. 2006) ....................................................................................5

*Milton H. Greene Archives, Inc. v. Marilyn Monroe LLC*,
   692 F.3d 983 (9th Cir. 2012) ..................................................................................14

-iii-

PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT ON DEFENDANTS'
LICENSE AFFIRMATIVE DEFENSE; DECLARATIONS

# TABLE OF AUTHORITIES
### (cont'd)

**Page(s)**

*Minden Pictures, Inc. v. John Wiley & Sons, Inc.*,
    2014 WL 1724478 (N.D. Cal. April 29, 2014) ..................................................11, 20

*Nafal v. Carter*,
    540 F. Supp. 2d 1128 (C.D. Cal. 2007).........................................................16

*Nafal v. Jay Z*,
    550 Fed. Appx. 468 (9th Cir. Dec. 20, 2013)...........................................15, 17

*New Hampshire v. Maine*,
    532 U.S. 742 (2001) ............................................................................14

*Russell v. Rolfs*,
    893 F.2d 1033 (9th Cir. 1990)..................................................................13

*S.O.S., Inc. v. Payday, Inc.*,
    886 F.2d 1081 (9th Cir. 1989)..................................................................20

*United Nat'l Ins. Co. v. Spectrum Worldwide, Inc.*,
    555 F.3d 772 (9th Cir. 2009)...................................................................13

*United States v. Vigneau*,
    187 F.3d 70 (1st Cir. 1999) ......................................................................8

**FEDERAL STATUTES**

17 U.S.C.
    § 106......................................................................................................19
    § 106(2) .................................................................................................19
    § 501(b) ...........................................................................................10, 11

**OTHER STATUTES**

Law No. 82 of 2002 on the Protection of Intellectual Property Rights...........................5, 17, 18, 20

**RULES**

Federal Rules of Civil Procedure
    Rule 12(b)(1) .............................................................................2, 10, 11, 13
    Rule 12(b)(6) ........................................................................................13
    Rule 60(b) ............................................................................................12

Local Rule
    7-3...........................................................................................................13
    7-18.........................................................................................................12
    56-1..........................................................................................................13

509358.2

-iv-

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES
## (cont'd)

Page(s)

**OTHER AUTHORITIES**

Berne Implementation Act, Pub. L. No. 100-568 ...........................................................................19

H.R. Rep. No. 609, 100th Cong., 2d Sess. 32-34 (1988) ...............................................................19

M. Nimmer, *Nimmer on Copyright*
  § 8.09[B][2] .................................................................................................................................23
  § 10.01[c][4] ..................................................................................................................................5

R. Rigamonti, *Deconstructing Moral Rights*, Harvard Int'l L.J., Vol. 47, No. 2, 353....................19

S. Rep. No. 352, 100th Cong., 2d Sess. 9-10 (1988), 1988 U.S.C.C.A.N. 3706 ............................19

509358.2

-v-

PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT ON DEFENDANTS'
LICENSE AFFIRMATIVE DEFENSE; DECLARATIONS

1    I.    **Introduction.**

2          Plaintiff asserted, in his motion for partial summary judgment (Dkt. 450 or

3    "Motion"), that under both United States and Egyptian copyright law, a copyright

4    licensee cannot "sublicense" its rights – i.e., convey a license to a third party –

5    without the consent of the copyright owner.  In Opposition (Dkt. 464 or "Opp."),

6    Defendants do not dispute this principle of copyright law.  Nor is there a dispute

7    over which document purportedly conveyed a license to Defendants; Defendants'

8    putative license is in a March 2001 Settlement Agreement between EMI Arabia and

9    defendant Timothy Mosley (a/k/a Timbaland).  Therefore, the dispositive question is

10   the following:

11               Is there any evidence that the owners of the *Khosara*

12               *Khosara* musical composition consented to the 2001

13               Settlement Agreement?

14         The answer is "no".  No one from EMI Arabia declared that he or she

15   received consent to sublicense rights to *Khosara Khosara*.  There is no document

16   showing that the original copyright owners (Plaintiff and other heirs of the composer

17   Baligh Hamdy), or even the owners' licensee of certain rights (Sout el Phan),

18   reviewed the 2001 Settlement Agreement, let alone approved of it.  Evidence of the

19   requisite consent does not exist.  Therefore, there is no issue for the jury to decide

20   on Defendants' license defense; the 2001 Settlement Agreement is not a valid

21   license, as a matter of law.

22         To attempt to salvage their defense, Defendants raise two red herrings.  First,

23   Defendants note that Plaintiff had authorized Sout el Phan to select others to exploit

24   *Khosara Khosara* in certain ways.  But even if the Court assumes that is true, Sout

25   el Phan was not the party that purportedly licensed rights to Defendants.  EMI

26   Arabia was.  And EMI Arabia did not have any permission to sublicense its rights.

27   Second, Defendants say that Sout el Phan and/or a company called Alam el Phan

28

-1-

1  implicitly consented to and/or "ratified" EMI Arabia's sublicensing of rights to

2  Defendants.  But, under the law, the licensor's consent to a sublicense must be

3  "explicit"; it cannot be implicit.  Moreover, Defendants' statement has no support in

4  the evidence.  There is no evidence that Sout el Phan or Alam al Phan ever learned

5  of the 2001 Settlement Agreement, let alone consented to its terms.

6      The Court's inquiry should end there.  Under the law, as agreed upon by the

7  parties, the 2001 Settlement Agreement is not a valid license.  Therefore, the Court

8  need not even reach the other, more narrow arguments raised in the Motion (which

9  are nevertheless meritorious, as explained below).

10     Finally, Defendants' request for *sua sponte* dismissal of the case pursuant to

11  Rule 12(b)(1) of the Federal Rules of Civil Procedure should be summarily denied

12  for multiple reasons.  <u>First</u>, the "standing" issue that Defendants raise is not

13  jurisdictional; therefore, Defendants' motion is untimely and procedurally improper.

14  <u>Second</u>, Defendants should be judicially estopped from claiming Plaintiff lacks

15  standing because Defendants successfully argued the opposite in order to obtain

16  dismissal of prior related cases.   <u>Third</u>, Plaintiff has standing to sue under U.S.

17  copyright law because he continues to own rights – both legal and beneficial – in the

18  *Khosara Khosara* composition.

19     For those reasons, as explained in more detail below, Plaintiff respectfully

20  requests that the Court summarily adjudicate Defendants' "license" defense and

21  deny Defendants' request for dismissal under Rule 12(b)(1).

22  **II.    <u>Summary Judgment Should Be Granted On Defendants' License Defense</u>**

23  **<u>Because The Owners Of The *Khosara Khosara* Musical Composition Did</u>**

24  **<u>Not Consent To The 2001 Settlement Agreement.</u>**

25      **A.    <u>Defendants Do Not Dispute The Governing Law.</u>**

26     In the Motion, Plaintiff asserted that an exclusive licensee of a copyright

27  cannot sublicense its rights absent the consent of the copyright owner.  Motion at

28

-2-

9:6-11:26.  In their Opposition, Defendants do not dispute this point of law.  Rather, they concede its applicability, arguing instead that there is adequate evidence of the requisite consent.  Opp. at 9:14-11:13.

In the Motion, Plaintiff also asserted that "Defendants bear the burden of producing specific evidence to show they possess a valid license to exploit Khosara Khosara."  Motion at 7:22-27.  In their Opposition, Defendants state that "Plaintiff has the burden of demonstrating the absence of any genuine issue of material fact <u>on his claim</u>."  Opp. at 7:24-25 (emphasis added).  But Defendants do not dispute that (a) a license is an affirmative defense (rather than a part of the plaintiff's claim), and therefore (b) <u>they</u> bear the burden of proof <u>on their defense</u>.

**B.    <u>There Is No Evidence That The Owners Of *Khosara Khosara*</u>**
**<u>Consented To The 2001 Settlement Agreement.</u>**

Plaintiff's uncontroverted fact number 1 is the following:  "The owners of the *Khosara Khosara* musical composition copyright did not consent to the 2001 settlement agreement between EMI Music Arabia and Timothy Mosley."  Dkt. 451, SSUF No. 1.  In their separate statement (Dkt. 465), Defendants say they dispute this fact.  However, the evidence to which Defendants cite creates no dispute.  There is no declaration that EMI Arabia obtained the requisite consent.  There is no document showing the copyright owners consented to the 2001 Settlement Agreement.  Instead, in their statement of genuine issues (Dkt. 465 at 1-2), Defendants cite to several pieces of evidence that are irrelevant to the issue at hand.

<u>First</u>, Defendants cite to "Wesley Decl., Ex. 2 (authorization given to Sout el Phan or "those it selects")."  Exhibit 2 is the agreement between Plaintiff and Sout el Phan.  The language that Defendants quote indicates that Plaintiff authorized Sout el Phan and "to those it selects" certain uses of *Khosara Khosara*.  This evidence, when construed in favor of Defendants, shows that <u>Sout el Phan</u> had the right to sublicense certain uses of *Khosara Khosara*.  It does not show that Sout el Phan had

the right to grant to EMI Arabia the right to sublicense.  It does not show that Sout el Phan actually granted to EMI Arabia the right to sublicense without obtaining the consent of it or the copyright owners.[1]

Second, Defendants cite to "Lewis Decl., Ex. 10 (rights granted to "whoever [Alam el Phan] selects")."  Exhibit 10 is the 2002 agreement between Plaintiff and Mohsen Mohammad Jaber (hereinafter the "2002 Agreement").  For the same reasons as stated above with regard to Exhibit 2, Exhibit 10 does not show that EMI Arabia had obtained consent to sublicense or consent to enter into the 2001 Settlement Agreement with Defendants.  At best, it shows that Mr. Jaber had the right to sublicense certain expressly authorized rights.  Moreover, the 2002 Agreement post-dated the license Defendants allegedly received in 2001.  In other words, at the time of the conveyance of the purported sublicense from EMI Arabia to Defendants, Mr. Jaber possessed no rights in *Khosara Khosara* and therefore could not have (a) consented to the sublicense or (b) conveyed to EMI Arabia the right to sublicense.

Third, Defendants cite to "Lewis Decl., Ex. 1, Fahmy Depo at 152:23-153:25, 197:21-198:17, 205:9-207:4."  None of this testimony, however, has anything to do with the issue of consent to the 2001 Settlement Agreement.  The first two excerpts simply confirm that the composer of *Khosara Khosara* (Baligh Hamdy), and later Hamdy's heir (Plaintiff), had granted certain rights to Sout el Phan.  And the last excerpt again confirms that Plaintiff had granted certain rights to Mr. Jaber (or his company Alam el Phan) in December 2002.

In sum, there is no record evidence that the owners of the *Khosara Khosara*

---

[1]   For this reason, Defendants' citation to *Ariel (UK) Ltd. v. Reuters Group PLC*, U.S. Dist. LEXIS 79319 at *18 (S.D.N.Y. Oct. 31, 2006), is inapposite.  *Ariel* would be relevant if Sout el Phan had sublicensed its rights to Defendants.  *Ariel* is not relevant because the party that purportedly sublicensed its rights (EMI Arabia) had no authorization to do so.

1  copyright consented to the "license" <u>conveyed by EMI Arabia</u> to Defendants.

2      **C.**      **Defendants' Potential Alternative Argument Is Unfounded In Law**

3      **And Evidence.**

4      Although absent from the section of the Opposition brief on the issue of

5  consent (Opp. at 9:13-11:13), Defendants state, in the form of their Additional

6  Material Facts Nos. 24 and 26, that (a) Alam el Phan and Sout el Phan "were aware

7  of and ratified . . . EMI Arabia's negotiation of a settlement with Mosley with regard

8  to Big Pimpin'", and (b) Alam el Phan has never challenged EMI Music Arabia's

9  ability to enter into the 2001 Settlement Agreement.  To the extent Defendants are

10 asserting that these purported facts demonstrate the requisite consent (which is

11 unclear based on the structure of the Opposition and Separate Statement), such an

12 assertion would be mistaken for several reasons.

13     <u>First</u>, under both Egyptian and American copyright law, a copyright owner's

14 consent to a sublicense cannot be implicit; it must be express and explicit.  Dkt. 452,

15 Wesley Decl., Ex. 6 (Law No. 82 of 2002 on the Protection of Intellectual Property

16 Rights (hereinafter "2002 Egypt Copyright Law"), Article 147 ("The author and his

17 universal successor shall have the exclusive right to authorize or prevent any form

18 of exploitation of his work…"), Article 149 ("The author shall be the owner of all

19 economic rights other than what he has explicitly signed."); *Gardner v. Nike, Inc.*,

20 279 F.3d 774, 781 (9th Cir. 2002) ("Requiring the licensee to get explicit consent

21 from the licensor strikes the balance between the competing interests that underlie

22 the 1976 Act and copyright law in general."); *Harris v. Emus Records Corp.*, 734

23 F.2d 1329 (9th Cir. 1984) ("A licensee, however, had no right to re-sell or

24 sublicense the rights acquired unless he has been expressly authorized to do so."),

25 quoting M. Nimmer, *Nimmer on Copyright*, § 10.01[c][4] (1983); cf. *Miller v. Glenn*

26 *Miller Productions, Inc.*, 454 F.3d 975, 993 (9th Cir. 2006) (extending *Gardner* to

27 the trademark context and holding that "a trademark licensee . . . may not sub-

28

1   license without express permission from the original licensor").

2       <u>Second</u>, even if the law allowed a copyright owner to consent implicitly to a

3   sublicense (which the law does not), there is no evidence that Sout el Phan or Alam

4   el Phan were even aware of the terms of the 2001 Settlement Agreement (or that the

5   agreement purportedly contained a "license").  To be sure, attached to the Ancliff

6   Declaration are emails from Alam el Phan indicating that it wanted EMI Arabia to

7   do something about *Big Pimpin'*.  But there is no indication, in those emails or

8   elsewhere, that Alam el Phan was consulted about, reviewed, or consented to the

9   2001 Settlement Agreement.

10       In fact, the evidence submitted by Defendants in support of their Opposition

11   and in discovery indicates that Alam el Phan and Sout el Phan were kept in the dark

12   about the 2001 Settlement Agreement.  Here is the relevant chronology:

13       <u>March 30, 2001</u>:  The effective date of the 2001 Settlement Agreement.  Dkt.

14   452, Wesley Decl., Ex. 4, p. 1.

15       <u>July 2001</u>:  The date when Mr. Mosley's lawyer says the 2001 Settlement

16   Agreement was fully signed and the settlement funds paid. LiCalsi Decl., ¶3.[2]

17       <u>August 8, 2001</u>:  At least weeks <u>after</u> the 2001 Settlement Agreement was

18   fully signed and the settlement funds paid – Christopher Ancliff of EMI Arabia

19   writes to the representative of Alam el Pham with whom he had been

20   communicating.  Mr. Ancliff says:  "I expect to be able to let you know the final

21   settlement of the Khasara Khasara infringement by early next week."  He goes on to

22   note: "However as this recording was licensed to us by Sout el Phan, I really do

23   need evidence that Funoon now owns or controls this repertoire.  We have been

24   requesting this information for some time and have still to receive it."  Wesley

25   _____

[2]   LiCalsi's statement is contradicted by an April 11, 2001 letter from his

26   colleague, Christopher Bavitz, to counsel for EMI Arabia (Thelen Reid), which

shows the agreement was signed and funds paid by April 11, 2011.  Wesley Reply

27   Decl., Ex. A.

28

1    Reply Decl., Ex. B.

2         This chronology shows that neither Mr. Ancliff nor any other EMI Arabia

3    representative had disclosed to Sout el Phan or Alam el Phan the existence or terms

4    of the 2001 Settlement Agreement before that agreement had been signed, sealed,

5    and delivered (whether that was in April 2001 – as the April 11, 2001 Bavitz letter

6    shows – or July 2001 – as Mr. LiCalsi says).   Moreover, based on Mr. Ancliff's

7    August 8, 2001 email, he did not plan to disclose to Alam el Phan any information

8    related to the 2001 Settlement Agreement unless he received confirmation of Alam

9    el Phan's rights, and there is no evidence that he received the requested information.

10   Thus, far from raising an inference that Alam el Phan had consented to the 2001

11   Settlement Agreement, the record supports the opposite conclusion.[3]

12        <u>Third</u>, even if Alam el Phan had been made aware of, and consented to, the

13   2001 Settlement Agreement (which the evidence shows did not occur), there is no

14   evidence that <u>Sout el Phan</u> was aware of that agreement.  And, as EMI Arabia

15   acknowledged, it was Sout el Phan (not Alam el Phan) who had licensed rights to

16   EMI Arabia.  Wesley Reply Decl., Ex B.  Therefore, there is no evidence that EMI

17   Arabia's licensors and thus the parties from which it needed consent – i.e., Sout el

18   Phan and the Hamdy heirs – were aware of, or consented to, the 2001 Settlement

19   Agreement.

20        In conclusion, there is nothing for a jury to weigh on the issue of consent.

21   There is no evidence showing the requisite consent; such evidence is required under

22   the law; Defendants' license defense fails as a matter of law without it.

23   _____

24   [3]  Had Sout el Phan or Alam el Phan reviewed the 2001 Settlement Agreement,
     they presumably would have asked for a portion or all of the settlement payment.
25   There is no evidence, however, that EMI Arabia gave any portion of the $100,000 it
26   received in settlement to Sout el Phan, Alam el Phan, or the owners of *Khosara*
     *Khosara*.  Indeed, the owners have not seen a dime of that money.  Dkt. 450, Fahmy
27   Decl., ¶11.

28

III.   **There Is No Admissible Evidence That EMI Arabia's Rights In *Khosara
Khosara* Extended Beyond June 10, 2007.**

In the Motion, Plaintiff contended that EMI Arabia's rights in *Khosara
Khosara* expired in June 10, 2007; therefore, even if EMI Arabia had conveyed a
license to Defendants, the license would have expired on June 10, 2007.  Motion at
13:21-15:12.  Defendants' arguments in opposition will be addressed in turn.

A.   **The 1995 EMI Arabia/Sout el Phan Agreement Was Not Renewed.**

Defendants first argue that the plain language of the 1995 license agreement
between EMI Arabia and Sout el Phan (Dkt. 452, Wesley Decl., Ex. 3) gave EMI
Arabia the right to renew or match any offer from a third party.  Opp. at 11:14-12:2.
Defendants alternatively assert that EMI Arabia exercised its right to renew by
entering into an agreement on August 1, 2008 (and subsequent agreements) with an
entity called Arab Audio FZ, LLC ("Arab Audio") that purported to grant EMI
Arabia certain rights, including to *Khosara Khosara*.  Defendants conclude that EMI
Arabia had rights in *Khosara Khosara* throughout the time period relevant to this
suit.  Opp. at 12:13-16.

The fundamental flaw in Defendants' arguments is a lack of admissible
evidence supporting them.  There is no evidence that EMI Arabia exercised its right
to renew the 1995 agreement with Sout el Phan.  And there is no admissible
evidence that Arab Audio ever owned any rights in *Khosara Khosara*, which is
required to prove that Arab Audio validly conveyed rights to EMI Arabia.[4]  *Gilliam
v. ABC, Inc.*, 538 F.2d 14, 21 (2d. Cir. 1976) (holding that "a grantor may not
convey greater rights than it owns" and, if the grantor does, it is "a nullity").

---

[4]   Nor can the agreements themselves prove Arab Audio's rights in *Khosara
Khosara*.  The agreements do not mention the *Khosara Khosara* composition.  And,
regardless, the truth of any representations made in the agreements would be
inadmissible hearsay.  *United States v. Vigneau*, 187 F.3d 70, 75 (1st Cir. 1999).

## B.   None Of Defendants' Other Arguments Is Persuasive.

The reasoning in the remainder of Defendants' section on the expiration of EMI Arabia's rights (Opp. at 12:17-14:9) is hard to follow and unpersuasive.

Defendants first seem to argue that Sout el Phan and Alam el Phan implicitly licensed Defendants the right to use *Khosara Khosara* because they encouraged EMI Arabia to enter into the 2001 Settlement Agreement.  Opp. at 12:17-13:3.  That argument, however, is false, as explained in Section II.D *supra*.  Defendants then quote the general legal principle that parties to an expired contract can create an implied-in-fact contract through continued performance.  Opp. at 13:3-9, quoting *Autohaus Brugger, Inc. v. Saab Motors, Inc.*, 567 F.2d 901, 915 (9th Cir. 1978). But there's no evidence that the parties to the 1995 Agreement – i.e., EMI Arabia and Sout el Phan – "continue[d] to perform as theretofore."  Defendants' final argument (Opp. at 12:17-13:9) appears to parrot their later assertion that Plaintiff gave up all of his rights in *Khosara Khosara* and thus lacks standing to sue. Plaintiff responds to that argument *infra* in Section V.C.5.

In sum, there is no admissible evidence showing that Defendants' purported "licensor" – i.e., EMI Arabia – owned any rights in *Khosara Khosara* after June 10, 2007.  Therefore, Defendants' post-June 10, 2007 exploitation of *Khosara Khosara* was unlicensed.  *Gilliam*, 538 F.2d at 21.

## IV.   Defendants Did Not Receive A Valid License Of The Right To Publicly Perform *Khosara Khosara* At Concerts.

In the Motion, Plaintiff argued that none of the agreements in the "chain of title" related to Defendants' "license" included the right to publicly perform *Khosara Khosara* at concerts; therefore, any performance – whether of the full composition or an excerpt thereof – would constitute copyright infringement. Motion at 15:13-17:19.

Defendants' response is two-fold.  First, Defendants say that Plaintiff no

longer owns any public performance right in *Khosara Khosara* because that right was transferred either to a performing rights society (SACERAU/SACEM) or to Alam el Phan.  Opp. at 14:12-15:8.  In other words, according to Defendants, if Plaintiff or the other Hamdy heirs performed *Khosara Khosara*, they would be the infringers.  Second, Defendants contend that the *Khosara Khosara* composition is registered with a performing rights organization called BMI, and therefore Defendants' performances of the *Khosara Khosara* excerpt in *Big Pimpin'* would have been covered by a blanket license from BMI.  Opp. at 15:9-16:6.

Plaintiff will respond to Defendants' first argument – i.e., that Plaintiff does not own any right to public performance – in Section V.C.5, *infra*.  With regard to their second argument, suggesting they had a blanket license from BMI, there is no evidence of that BMI granted Defendants a license to publicly perform *Khosara Khosara*.  It was Defendants' burden to submit such evidence.  They did not. Therefore, there is no admissible evidence that Defendants were licensed to publicly perform any portion of the *Khosara Khosara* composition.

## V.    **Defendants' "Motion" For *Sua Sponte* Dismissal Should Be Denied.**

Defendants request that the Court *sua sponte* dismiss this case for lack of jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure.  Opp. at 16:13-19:5.  Defendants argue that (a) under 17 U.S.C. Section 501(b), only a "legal or beneficial owner of an exclusive right under a copyright" is entitled to sue for infringement; (b) Plaintiff is not a "legal or beneficial owner" because he assigned away all of his rights in *Khosara Khosara* in the 2002 Agreement; therefore, (c) Plaintiff lacks "standing" to sue and this Court lacks jurisdiction over the case.

Defendants' argument lacks merit for several reasons.  First, "statutory standing" – as opposed to Article III standing – is not jurisdictional.  Therefore, Defendants' request is procedurally improper, the Court should not *sua sponte*

-10-

consider the issue raised by Defendants, and dismissal under Rule 12(b)(1) is inappropriate.  <u>Second</u>, Defendants should be judicially estopped from arguing that Plaintiff lacks standing to sue.  To obtain dismissal of related cases, Defendants claimed that Plaintiff (and the other heirs) are the only parties who have standing to bring the claims raised herein.  Having benefitted from those statements, Defendants should be estopped from now assuming the opposite position.  <u>Finally</u>, Plaintiff (and the other heirs) without question continue to own – both legally and beneficially – rights in *Khosara Khosara*.  They have standing.

## A. The "Motion" Is Procedurally Improper.

### (1) Statutory standing is not jurisdictional.

Defendants argue that Plaintiff does not meet the definition, in the 1976 U.S. Copyright Act, of a person with standing to sue for copyright infringement – i.e., Defendants argue that Plaintiff lacks "statutory standing".  The United States Supreme Court, however, recently clarified that statutory standing "does not implicate subject-matter jurisdiction, i.e., the court's statutory or constitutional power to adjudicate the case."  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1387 n.4 (2014) (citations and internal quotations omitted). Therefore, whether a plaintiff meets the statutory definition in Section 501(b) is not a jurisdictional issue, and Rule 12(b)(1) is inapplicable.  *Hyperquest, Inc. v. N'Site Solutions, Inc.*, 632 F.3d 377, 381 (7th Cir. 2011) (Section 501(b) is not jurisdictional); *Minden Pictures, Inc. v. John Wiley & Sons, Inc.*, 2014 WL 1724478, at **3-4 (N.D. Cal. April 29, 2014) (citing to *Lexmark* and *Hyperquest* and holding that whether a plaintiff satisfies Section 501(b) is not jurisdictional). That distinction is significant because a challenge to Plaintiff's claim, as opposed to this Court's jurisdiction, is subject to the normal rules of procedure, several of which Defendants violate.

**(2)   The "motion" is an improper and untimely motion for reconsideration.**

On May 2, 2011, after extensive briefing and a hearing, this Court ruled, as a matter of law, "that plaintiff Osama Fahmy has standing to bring claims that defendants' works infringed the 'Khosara, Khosara' copyright." Dkt. 271 at 18:21-22.  Now, nearly four years later, Defendants ask the Court to reconsider its prior ruling.

Under Rule 60(b) of the Federal Rules of Civil Procedure, a motion for reconsideration "must be made within a reasonable time – and for reasons (1), (2), and (3) no more than a year after the entry of the . . . order . . ."  Defendants' nearly four-year delay violates the one-year time limit applicable to subsections (1)-(3) of Rule 60(b) and, regardless, is not within the "reasonable time" required under all subsections of the rule.

Defendants imply that their timing is attributable to this Court's ruling limiting damages to August 31, 2004 to the present.  Opp. at 17:8-17.  But the ruling on damages issued in December 2011.  Dkt. 309.  It was not reasonable for Defendants to have waited three-and-a-half years after that order to move for reconsideration.  Moreover, it is unclear why the December 2011 damages ruling matters.  Defendants are now asserting that, in 2002, Plaintiff had transferred away all rights, including his right to sue for past infringement.  Based on their argument, the limitation on the damage period is irrelevant, and there is no reasonable justification for the timing of Defendants' request for reconsideration.[5]

**(3)   The "motion" is untimely under the scheduling order.**

Under this Court's operative scheduling order, Dkt. 399, the deadline to file all motions was February 2, 2015.  Defendants filed their request – in an unrelated opposition brief – on February 27, 2015.  Defendants have not attempted to show

---

[5]   For this reason, Defendants' motion also violates Local Rule 7-18.

-12-

1  good cause to modify the scheduling order.  Nor is there any.

2          **(4)**    **Rule 12(b)(1) is inapplicable.**

3          As explained *supra*, Defendants' "motion" cannot be granted under Rule

4  12(b)(1) because a challenge to statutory standing is not jurisdictional.  It is unclear

5  what, if any, alternative rule Defendants believe would apply.  For example, if the

6  request were considered under Rule 12(b)(6), then the motion is untimely under the

7  deadlines set forth in Rule 12.  Moreover, Plaintiff clearly pled allegations sufficient

8  to evidence his standing to sue, whether statutory or Article III.  E.g., Dkt. 1, ¶¶2, 8-

9  11, 26, 45.  And if the request were considered as a motion for summary judgment,

10  then the request is not supported by a noticed motion or a statement of undisputed

11  facts and conclusions of law, as required by Local Rule 56-1.  Nor did Defendants

12  meet and confer as required under Local Rule 7-3.

13          Defendants' "motion" should be denied before even reaching the merits.

14  **B.**    **Defendants Are Judicially Estopped From Claiming Plaintiff Lacks**

15          **Standing.**

16          **(1)**    **The doctrine of "judicial estoppel" bars a party from taking**

17                  **inconsistent positions in the same or different cases.**

18          "The doctrine of judicial estoppel, sometimes referred to as the doctrine of

19  preclusion of inconsistent positions, is invoked to prevent a party from changing its

20  position over the course of judicial proceedings when such positional changes have

21  an adverse impact on the judicial process." *Russell v. Rolfs*, 893 F.2d 1033, 1037

22  (9th Cir. 1990) (citation omitted).  "Judicial estoppel not only bars inconsistent

23  positions taken in the same litigation, but bars litigants from making incompatible

24  statements in two different cases." *United Nat'l Ins. Co. v. Spectrum Worldwide,*

25  *Inc.*, 555 F.3d 772, 778 (9th Cir. 2009).

26          Key considerations in the judicial estoppel analysis are (1) whether the party's

27  current position is "clearly inconsistent" with the earlier position; (2) whether "the

28

-13-

1   party has succeeded in persuading a court to accept that party's earlier position, so

2   that judicial acceptance of an inconsistent position in a later proceeding would

3   create the perception that either the first or the second court was misled"; and (3)

4   whether [the party] "would derive an unfair advantage or impose an unfair

5   detriment" if not estopped.  *New Hampshire v. Maine*, 532 U.S. 742, 750-51 (2001)

6   However, the aforementioned factors are not necessarily exclusive because judicial

7   estoppel is "probably not reducible to any general formulation."  *Id.* at 750.

8          Finally, it should be noted that, although relevant, a finding of "chicanery or

9   knowing misrepresentation by the party to be estopped" is not a prerequisite to

10  application of judicial estoppel.  *Milton H. Greene Archives, Inc. v. Marilyn Monroe*

11  *LLC*, 692 F.3d 983, 995 (9th Cir. 2012).

12                    **(2)    Judicial estoppel bars Defendants' argument.**

13                            **(a)    Defendants took clearly inconsistent positions.**

14         In both 2005 and 2011, Defendants were sued by a man named Julian Nafal.

15  Claiming to own a license in certain rights in *Khosara Khosara*, Mr. Nafal sued

16  Defendants for infringing the *Khosara Khosara* composition copyright through their

17  exploitation of *Big Pimpin'*.  In the first suit, CV05-2480-SVW, Defendants moved

18  for summary judgment, arguing that Mr. Nafal lacked standing to sue them for

19  infringement.  In the second suit, CV11-06238-SVW, Defendants moved for

20  dismissal, again arguing that Mr. Nafal lacked standing to sue them for

21  infringement.

22         In their motions for judgment as a matter of law, Defendants repeatedly

23  asserted that the heirs of Baligh Hamdy – including Plaintiff herein – were the only

24  persons with standing to sue for infringement of the *Khosara Khosara* copyright.

25  Wesley Reply Decl., Ex. D at 13:6-8 ("Plaintiff [Nafal]'s claimed rights, if any, are

26  as a licensee, not a copyright owner or an assignee of the entire copyright.  The

27  Hamdy heirs remain the acknowledged copyright owners.") (emphasis added); *id.* at

28

-14-

1:6-8 ("Even crediting Plaintiff [Nafal]'s claimed chain of title, <u>the true (and only) owners of copyright in Khosara Khosara are the heirs of the (alleged) original author located in Egypt.</u> ") (emphasis added); Ex. E at 13:22-25 ("Through this chain, <u>the actual copyright owners, the Hamdy heirs,</u> sought to evade involvement in this lawsuit.") (emphasis added); Ex. F at 1:6-10 ("This new action comes . . . after one of the actual copyright owners filed his own, still pending, lawsuit asserting the same claims.  Fahmy v. Carter, Case No. CV 07-05715 CAS (PJWx)."); *id.* at 5:6-8 ("The copyright owners did not consent to the 2008 Assignment Agreement, and will not consent, having brought their own lawsuit ***before*** this alleged transfer . . . .") (emphasis in original); *id.* at 8:2-7 ("Unlike his allegation with respect to the 2005 Assignment Agreement, nowhere does Plaintiff [Nafal] allege that Fahmy (or the other copyright owners) consented to the 2008 Assignment Agreement.  Fahmy did not sign it.").

To summarize, according to Defendants' court filings in 2007 and 2011, the Hamdy heirs, including Fahmy, were the proper – indeed, "indispensable" – parties to any infringement case involving *Khosara Khosara*.[6]  Defendants' prior positions are incompatible with their current position – i.e., that the Hamdy heirs wholly lack standing to litigate an infringement claim regarding *Khosara Khosara*.

### **(b)** <u>**Defendants succeeded with their earlier position.**</u>

Defendants succeeded in convincing another district judge and the Ninth Circuit of the merit of their earlier position.  *Nafal v. Jay Z*, 550 Fed. Appx. 468, 469 (9th Cir. Dec. 20, 2013) ("the district court properly dismissed this action

---

[6]   In the second *Nafal* case, Defendants also argued in 2011 that an assignment between the plaintiff Nafal and a third party Sima was invalid because the Hamdy heirs (i.e., the true copyright owners) had not consented to it.  Wesley Decl., Ex. F at 7:19-9:2.  Coincidentally, this argument parallels Plaintiff's argument, *supra*, that the "license" between Defendants and EMI Arabia is invalid because the Hamdy heirs (i.e., the true copyright owners) did not consent to it.

1   because Nafal failed to join the copyright owners as required under the Copyright

2   Act of 1909."); 3/2/12 Order re Defendants' Motions to Dismiss, Wesley Reply

3   Decl., Ex. G at 5 ("even if Plaintiff were deemed a 'co-exclusive licensee,' the 1909

4   Act would require him to join Sima and the Hamdy heirs in this action through the

5   filing of a first amended complaint"); *Nafal v. Carter*, 540 F. Supp. 2d 1128, 1138

6   (C.D. Cal. 2007) ("even if Plaintiff [Nafal] is designated as a co-owner of an

7   exclusive license, he could not proceed with the lawsuit without joining the Hamdy

8   heirs (the copyright owners) and Sima (the other co-owner of the 'exclusive

9   license').").

10              **(c)**    **Defendants would derive an unfair advantage or**

11                         **impose an unfair detriment if not estopped.**

12          Defendants did not just tell courts that the Hamdy heirs are the only parties

13   who can sue them.  Defendants went so far as to criticize the Hamdy heirs for <u>not</u>

14   bringing the suit on their own behalf, speculating that they did not sue in order to

15   avoid "personal inconvenience" and "discovery obligations."  Wesley Reply Decl.,

16   Ex. D at 1:8-10.

17          Plaintiff took Defendants up on their offer.  He, on behalf of himself and the

18   other Hamdy heirs, brought this lawsuit to hold Defendants accountable for their

19   infringement.  Now, after over seven years of litigation and after the issue of

20   standing was decided nearly four years ago, Defendants are saying they didn't really

21   mean that the Hamdy heirs have standing to sue.  Rather, according to Defendants,

22   some other third party who has never claimed ownership in *Khosara Khosara*, who

23   has never sought to intervene in this case, and who submitted no evidence in support

24   of Defendants' position, is the real party-in-interest.

25          Accepting Defendants' about face would impose an unfair detriment on

26   Plaintiff and the Court.  Plaintiff would have proceeded through over seven years of

27   litigation based on the assumption that Defendants conceded that he and the Hamdy

28

-16-

heirs had standing to sue, only to have Defendants reverse course at the eleventh hour and argue the opposite.  Moreover, if Defendants are not estopped, they would derive the ultimate unfair advantage – i.e., avoiding liability in the Nafal suit by arguing that Fahmy, as Hamdy heir, <u>is</u> the proper plaintiff; then avoiding liability in this suit by arguing that Fahmy, as Hamdy heir, is <u>not</u> the proper plaintiff; and thus never being required to answer for their obvious infringement of Hamdy's composition.

Defendants should be judicially estopped from disputing Plaintiff's standing.

**C.**     **Plaintiff Has Standing Because He Is A Legal Or Beneficial Owner Of Exclusive Rights Protected Under United States Copyright Law.**

**(1)     Standing is evaluated under the 1909 U.S. Copyright Act.**

Defendants have previously argued, and the Ninth Circuit agreed, that the 1909 Copyright Act governs standing to sue for infringement of *Khosara Khosara* because that musical composition was created when the 1909 Copyright Act was operative.  Wesley Reply Decl., Ex. D at 11:13-13:12; *Nafal v. Jay Z*, 550 Fed. Appx. at 468.  Plaintiff therefore applies the standing principles under the 1909 U.S. Copyright Act.

**(2)     A copyright owner who licenses certain rights continues to have standing to sue under the 1909 U.S. Copyright Act.**

Defendants have previously argued that, under the 1909 Copyright Act, an exclusive licensee lacked standing to bring an action for infringement unless the licensee joined the original copyright owner.  Wesley Decl., Ex. D at 12:5-19 (citations omitted).  In other words, under the 1909 Copyright Act, only the original author, or an assignee of the entirety of the author's rights in the copyright, has standing to sue.  See *Manning v. Miller Music Corp.*, 174 F. Supp. 192, 194 (S.D.N.Y. 1959) (only a copyright "proprietor" – i.e., "either the author of the work or his assignee" – has standing to sue under 1909 Act).  Thus, whether Plaintiff has

1  standing to sue herein hinges on whether Plaintiff conveyed away the entirety of his

2  rights in *Khosara Khosara*, or whether Plaintiff simply authorized use of certain

3  rights while retaining ownership.  As explained below, Plaintiff did the latter.

**(3)   Egyptian law controls whether Plaintiff has any ownership rights in the *Khosara Khosara* copyright.**

6      Although the 1909 Copyright Act provides that only a copyright "proprietor"

7  has standing to sue for infringement in the United States, Egyptian law determines

8  whether Plaintiff owns any portion of the copyright in the *Khosara Khosara* musical

9  composition.  *Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, 153 F.3d 82,

10  88-92 (2d Cir. 1998) (to evaluate standing under U.S. Copyright Act, the court first

11  determines ownership rights under law of country of origin of copyright).

**(4)   Under Egyptian law, an author cannot assign away his entire interest in a copyright.**

14      Under Egyptian law, an author and his heirs cannot assign away their entire

15  interest in a copyright.  That is so because an author and his heirs "shall enjoy over

16  the work perpetual imprescriptible and inalienable moral rights" that "include . . .

17  [t]he right to prevent any modification considered by the author as distortion or

18  mutilation of the work."  2002 Egypt Copyright Law, Article 143.  In other words,

19  regardless of whether an Egyptian author can transfer rights to make certain

20  derivative works (which Plaintiff disputes, but this Court previously concluded was

21  possible), there is no question that an author cannot transfer the entirety of his right

22  to make derivative works.  He and he alone always retains, whether he likes it or

23  not, the right to make (or to prevent the making of) any derivative work that he

24  believes is a distortion or mutilation of his original work.[7]  Therefore, regardless of

25

26  _____

[7]   Sout el Phan itself acknowledged that it had no right to make a derivative work

27  from *Khosara Khosara*, providing EMI Arabia a certificate explaining that Sout el

Phan's rights did not extend to amending or modifying *Khosara Khosara*, or

28  (footnote continued)

-18-

the scope of rights purportedly licensed or assigned away by Plaintiff, he could not
have irrevocably transferred the right to make (or to prevent the making of)
derivative works that he believes is a distortion or mutilation of his original work.
Plaintiff still owns that right in *Khosara Khosara*.  Plaintiff, therefore, has standing
to sue.[8]

(5)   **Even if Plaintiff could have transferred all of his ownership
interest in *Khosara Khosara*, he did not do so.**

Regardless, even if Plaintiff could have validly given away every last sliver of
every stick in the bundle of rights he owned in the *Khosara Khosara* copyright
(which he could not have done under Egyptian law, as explained above), he did not
do so.  As explained directly *infra*, the 2002 Agreement did not explicitly and
clearly transfer ownership of the entirety of the *Khosara Khosara* copyright, as

_____

merging it with any other music. Dkt. 464, Ancliff Decl., Ex. 3, Pages 33 and 35.

[8]   Plaintiff's right to make (or prevent the making of) derivative works that he
believes are a distortion or mutilation of the original work is enforceable herein
because it is within the scope of the "right to prepare derivative works" protected
under U.S. copyright law.  17 U.S.C. §106(2).  In other words, the right to make
derivative works under U.S. copyright law includes, but is broader than, the moral
right under Egyptian law.  Congress recognized that principle when the United
States became a signatory of the Berne Convention in 1988, through the Berne
Implementation Act, Pub. L. No. 100-568.  Congress expressly declined to amend
the U.S. Copyright Act to add protection for moral rights because it found that "a
composite of laws" in the United States already "provide[d] the kind of protection
envisioned by Article 6 *bis*" of the Berne Convention.  H.R. Rep. No. 609, 100th
Cong., 2d Sess. 32-34 (1988); *see also* S. Rep. No. 352, 100th Cong., 2d Sess. 9-10
(1988), 1988 U.S.C.C.A.N. 3706, 3714-15 (same).  One of the specific examples
cited by the House was "17 U.S.C. § 106, relating to derivative works."  *Id.*; see also
*Gilliam*, 538 F.2d at 21 ("[T]he ability of the copyright holder to control his work
remains paramount in our copyright law"); R. Rigamonti, *Deconstructing Moral
Rights*, Harvard Int'l L.J., Vol. 47, No. 2, 353, 368 (Summer 2006) ("[T]he
economic right to create derivative works may be used to prohibit the publication of
unauthorized modifications of the author's work, which is the main concern of the
moral right of integrity.").

-19-

1    required for a valid copyright assignment.  Moreover, as also explained *infra*, the

2    parties to the 2002 Agreement intended it to be a license of the right to distribute a

3    recording of, *inter alia*, *Khosara Khosara*, not a conveyance of ownership and title

4    of that composition.

5                   **(a)**      **An author retains all rights in his copyright that are**

6                          **not explicitly and clearly transferred.**

7          Under both Egyptian and American copyright law, rights in a copyright can

8    only be conveyed to a third party if the transfer is clear and explicit.  2002

9    Copyright Act, Article 149 ("Such a transfer shall be certified in writing and contain

10   an explicit and detailed indication of each right to be transferred with the extent and

11   purpose of transfer and the duration and place of exploitation."); *Minden Pictures*,

12   10 F. Supp. 3d at 1129 ("[A] transfer of copyright ownership must be express and

13   clear.").  Moreover, a copyright license "must be construed in accordance with the

14   purposes underlying federal copyright law . . . [chief] among these purposes is the

15   protection of the author's rights."  *S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1088

16   (9th Cir. 1989).

17                  **(b)**      **The 2002 Agreement is an authorization to make**

18                         **certain uses, not a conveyance of all right and title.**

19         By its plain terms, the 2002 Agreement is an "<u>Authorization</u> to Print, Publish,

20   Sell, and Circulate."   Dkt. 464, Lewis Decl., Ex. 10, P. 77 (emphasis added).  It is

21   <u>not</u> an "Authorization to Print, Publish, Sell, Circulate, <u>Make Derivative Works,</u>

22   <u>Arrange or Re-Arrange, Add New Words and Music, and Perform</u>."  Nor is it titled

23   or structured as a conveyance of all right and title in the composer's works.  Indeed,

24   if the purpose of the agreement had been to convey ownership of all rights in the

25   relevant works, then why would the parties have detailed the types of rights being

26   authorized?  If the parties had intended to convey all right and title in the works,

27   they would have just said as much.

28

1

**(c)**  **There is no explicit and clear transfer of ownership of**

2

**the right to make derivative works from the work.**

3      Plaintiff did not expressly and clearly assign away his right to make

4  derivative works from *Khosara Khosara*.  Absent from the 2002 Agreement are any

5  of the following words or phrases one would expect in an explicit and clear transfer

6  of the right to make derivative works:  "derivative," "sample," "interpolate,"

7  "arrange," "re-arrange," "combine with new lyrics," "add new expression,"

8  "synchronize," "modify," "adapt," etc.  Also absent from the 2002 Agreement is any

9  indication of "the extent and purpose" of the purported transfer of the right to make

10  derivative works, as required under Article 149.

11      The language to which Defendants cite in no way represents an explicit and

12  clear transfer of ownership of the right to make derivative works.

13      First, according to Defendants, the 2002 Agreement says that "Alam el Phan

14  (and its president) "were becoming *sole owners*" of the financial usage rights.  Opp.

15  at 18:4-7 (emphasis in original).  But that's not what it says at all.  It says Mr. Jaber

16  and/or his successors are "solely the owners of the financial usage rights stated in

17  Law No. 82 FOR THE YEAR 2002."  In other words, it clarifies that Jaber owns

18  financial rights, not moral rights, and is <u>not</u> the owner of the entirety of all rights in

19  the works.  Regardless, the language to which Defendants cite does not clearly and

20  explicitly transfer ownership of the right to make derivative works (a right that the

21  licensor did not believe was a transferrable economic right at all).  Dkt. 452, Wesley

22  Decl., Ex. 8, 6/30/10 Fahmy Decl., ¶¶7-8.

23      Second, Defendants note that the uses authorized by Plaintiff include "all the

24  usage means and methods whether those currently available or those that will be

25  invented in the future."  Opp. at 18:8-10.  That provision does not clearly and

26  explicitly transfer ownership of the right to make derivative works.  It simply

27  clarifies that if someone invents a new way to record songs in the future – e.g.,

28

-21-

1    digital downloads, streaming – then the licensee's right to distribute the songs

2    extends to new media.

3          <u>Third</u>, Defendants observe that the 2002 Agreement extends the rights

4    "during the whole legal protection period specified by the law."  Opp. at 18:11-12.

5    But that provision does not relate to the substantive scope of the rights being

6    licensed; it relates to the temporal scope of the license.

7          <u>Fourth</u>, Defendants cite to language in the final paragraph of the first page of

8    the 2002 Agreement as conveying "any other contracts and/or rights" in the

9    applicable music.  But that paragraph is discussing Plaintiff's resolution of any

10   claims against the Hamdy heirs' prior licensee, Sout el Phan.  In other words, the

11   paragraph indicates that any monies owed to Plaintiff by Sout el Phan would now go

12   to Jaber.  Nothing in that paragraph expressly states that the licensee can make

13   derivative works from the compositions.

14         In sum, there is no language in the 2002 agreement that clearly and explicitly

15   conveys away Plaintiff's right to make derivative works.

16               **(d)**    <u>**There is no explicit and clear transfer of the right to**</u>

17                       <u>**publicly perform the work.**</u>

18         Nor is there any explicit and clear transfer of the right to publicly perform

19   *Khosara Khosara*.  Indeed, the 2002 Agreement expresses the exact opposite.  At

20   the conclusion of the 2002 Agreement, Plaintiff recites:  "I received the amount of

21   115,000 (only one hundred fifteen thousand Egyptian Pounds) for this waiver and

22   declaration <u>while maintaining our rights in respect of the public performance and</u>

23   <u>mechanical printing</u>."  Dkt. 464, Lewis Decl., Ex. 10, Page 79 (emphasis added).

24   Thus, Plaintiff did not give away all of his rights to publicly perform *Khosara*

25   *Khosara* in the 2002 Agreement.

26         In the alternative, Defendants contend that Plaintiff transferred all of his

27   public performance rights to a performing rights society, SACEM.  In support of

28

that argument, Defendants cite to a July 2007 letter, purportedly from Plaintiff to a U.S. attorney,[9] and the fact that Baligh Hamdy was a member of SACERAU and SACEM.  Defendants' argument is unfounded for two fundamental reasons.  <u>First</u>, SACEM itself (along with Plaintiff) confirms that the Hamdy heirs continue to own rights in *Khosara Khosara*.  Diringer Decl., ¶4.  Indeed, Defendants' own exhibits indicate that Hamdy is still recognized as a rights holder by, and subject to royalties from, BMI.[10]   Dkt. 464, Lewis Decl., Ex. 11 (listing Hamdy as participant and status as "PAY"), Ex. 12.  <u>Second</u>, even if SACEM were technically the legal owner of the composition in *Khosara Khosara* (which SACEM disavows), Plaintiff is still a beneficial owner, with standing to sue, because he is paid royalties from SACEM.[11]  *Love v. The Mail on Sunday*, 2006 WL 4046180 (C.D. Cal. Aug. 15, 2006) (composer who assigns title to work in exchange for payment of royalties is

_____

[9]     The letter was not from Plaintiff.  Wesley Reply Decl., Ex. H, Fahmy Depo at 126:126:24-127:10.  It was a letter from an Egyptian lawyer, who clearly does not speak English as a first language.  The statements therein are hearsay and inadmissible legal opinion.  Regardless, to the extent the lawyer intended to convey a belief that Plaintiff did not own any performance rights in *Khosara Khosara*, that would be inaccurate, as confirmed by SACEM itself, and irrelevant, because Plaintiff would at the least be considered a beneficial owner of those rights.

[10]    Why EMI Blackwood (Jay-Z's publisher) is listed in BMI's records as a publisher of *Khosara Khosara* is odd, particularly where EMI Blackwood has no relationship with the composers and disavowed any ownership of, or license in, *Khosara Khosara*.  Wesley Reply Decl., Ex. I, Sandsmark Depo at 10:18-11:13.

[11]    Defendants' citation to SACEM regulations is another smokescreen.  The regulations are inadmissible hearsay.  Nor can this Court simply take judicial notice of the truth of statements on the webpage of a private foreign organization.  Regardless, the regulations simply state that SACEM has standing to sue to force a third party to pay performance royalties.  But this suit isn't about Defendants' failure to pay performance royalties.  It is about Defendants' exploitation of an altered and unauthorized form of Plaintiff's composition.  *Nimmer on Copyright*, § 8.09[B][2] (noting that performance of an altered or derivative form of a musical composition is not covered by a performance license).

1  "beneficial owner" who has standing to sue).

2          (e)    **Plaintiff intended to convey only the right to use the**

3                 ***Khosara Khosara* composition in a particular sound**

4                 **recording to be used and sold on tapes, CDs, etc.**

5          Plaintiff did not clearly and explicitly assign away all of his rights in *Khosara*

6  *Khosara*.  Therefore, he has standing – end of story.  However, an examination of

7  additional circumstances makes it pellucid that Plaintiff is still the owner of rights in

8  the *Khosara Khosara* composition.

9          First, there is uncontroverted direct testimony from one of the parties to the

10 2002 Agreement that the agreement is, and was always intended to be, a license to

11 use recordings of certain compositions in CDs, albums, etc.  Dkt. 452, Wesley Decl.,

12 Ex. 8, 6/30/10 Fahmy Decl., ¶¶7-9; Dkt. 464, Wesley Reply Decl., Ex. H, Fahmy

13 Depo at 197:21-207:7.  The agreement does not, and was not intended to, transfer

14 away any, let alone all, rights in the musical compositions.  *Id.*  Indeed, in the over

15 12 years since the formation of the 2002 Agreement, neither Mr. Jaber nor any

16 associate nor any other third party has claimed to own the entirety of the *Khosara*

17 *Khosara* copyright.  *Cf. Jules Jordan Video, Inc. v. 144942 Canada, Inc.*, 617 F.3d

18 1146, 1157 (9th Cir. 2010) (rejecting alleged infringer's argument about invalid

19 copyright transfer where no dispute between copyright owner and transferee).

20         Second, the 2002 Agreement says nothing about *Big Pimpin'* or anything else

21 connected to the infringement claim.  Yet, at the time of the 2002 Agreement,

22 Plaintiff was attempting, through U.S.-based agents, to assert an infringement claim

23 worth at least hundreds of thousands of dollars.  Dkt. 288, 9/26/11 Fahmy Decl.,

24 ¶¶3-10.  It would have been nonsensical to sign away that claim in exchange for

25 payment of around $25,000 U.S. dollars.  *Fishman v. LaSalle Nat'l Bank*, 247 F.3d

26 300, 302 (1st Cir. 2001) ("The presumption in commercial contracts is that the

27 parties were trying to accomplish something rational.  Common sense is as much a

28

PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT ON DEFENDANTS'
LICENSE AFFIRMATIVE DEFENSE; DECLARATIONS

part of contract interpretation as is the dictionary or the arsenal of canons."); Wesley Reply Decl., ¶12, Ex. K (in 2002, 115,000 Egyptian lbs. = approx. $25,000). Just as unreasonable would be finding that Plaintiff assigned away his infringement claim, along with all right and title to *Khosara Khosara*, without ever mentioning it in the 2002 Agreement. And because the 2002 Agreement was an authorization of certain rights, not an assignment of ownership, Plaintiff continued to pursue the infringement claim, first through designated representatives and then himself in the years following entry into the agreement. Dkt. 288, 9/26/11 Fahmy Decl., ¶¶3-10.

Third, the other party to the 2002 Agreement, Mr. Gaber, owns a record company. Dkt. 249-2, 1/17/11 Loutfi Decl., ¶14. As defendant Universal Music's representative noted, record companies own and/or administer sound recordings; music publishers own and/or administer music compositions. Wesley Reply Decl., Ex. K, Trotman Depo at 26:25-30:6. It would be highly irregular for a record company to own and administer the composition itself.[12]

In sum, Egyptian copyright principles, the language and structure of the 2002 Agreement, evidence of the intent of the parties to the agreement, and surrounding circumstances all lead to one conclusion – i.e., the 2002 Agreement authorized or licensed certain rights; it did not strip Plaintiff of any and all ownership of *Khosara Khosara*. As this Court previously concluded, and as Defendants repeatedly trumpeted in related cases, Plaintiff has standing to sue.

---

[12] In fact, in another agreement between EMI Arabia and the purported affiliate of Alam al Phan, the parties agreed that all records they distributed would bear the universal symbol for ownership of a sound recording copyright – a "p" inside a circle. Wesley Reply Decl., Ex. C, EMA0024-25 ("All Records released hereunder shall bear on the labels and packaging thereof the legend (P) 2006 Copyright in this Sound Recording is owned and Published by [Alam El-Phan] or [Sout El-Phan] under exclusive license to EMI Music Arabia.").

1   Dated:  March 16, 2015         BROWNE GEORGE ROSS LLP

2                                Peter W. Ross
                                  Keith J. Wesley

3                                Christina J. Johnson

4

5                        By:       s/ Keith J. Wesley
                                  Keith J. Wesley

6                       Attorneys for Plaintiff Osama Ahmed Fahmy